## CITY OF NEW ORLEANS *v.* MRS. J. C. DE ST. ROMES.

<span style="float:right">9 573<br>49 439</span>

That part of the 3d section of the Act of 1852, (an Act providing for the subscription by parishes and municipal corporations of the State to the stock of corporations undertaking works of internal improvement,) which requires that the police jury or municipal corporation shall cause to be furnished to the commissioners of election a properly certified list of the authorized voters, is directory only, and a failure to furnish said list, cannot be regarded as a condition precedent to the validity of the subscription.

Where a formality is not absolutely necessary for the observance of justice, but is intended to facilitate its observance, its omission, unless there is an annulling clause in the law, will not annul the act.

A statute is to be considered as imperative in every particular which is essential to the thing required to be done, and merely directory as to those which are immaterial. *Buchanan*, J., dissenting.

The legislative injunction contained in the 3d section of the Act of 1852, to furnish to the commissioners of election a certified list of voters who were landed proprietors, was imperative, and the furnishing of such list a condition precedent to the holding of a valid election under the statute, in default of which the ordinances subscribing to stock remained without effect. *Buchanan*, J., dissenting.

Under the Act of 1852, the city is made the mandatary of the landed proprietors, for the purpose of subscribing to the stock of railroad companies. *Buchanan*, J., dissenting.

It is a general rule of the contract of mandate, that the principal is only bound to execute the engagements of his agents, conformably to the power which has been conferred. C. C. 2290. *Buchanan*, J., dissenting.

A mandatary, under a special power, must confine himself strictly within the limits assigned to him, and those dealing with him must, at their peril, see that he does not exceed his authority—but they need not, in search of his powers and their limitations, look beyond the instrument of mandate. *Buchanan*, J., dissenting.

If the clause of the Act of 1852, under consideration, was not a condition precedent, the omission of which imported a nullity of the ordinances by the terms of the statute itself, it was, at least, a condition subsequent, essential to the validity of the election held under the ordinances. *Buchanan*, J., dissenting.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J.

*Labatt & Eustis, Jr.*, and *Randell Hunt*, for plaintiff and appellant:

In *R.* v. *Woodstanton*, 1 Bott., 610, (cited in Dwarris on St., 714,) the distinction between directory and compulsory statutes was applied to st. 43, El. c. 2, s. 5, which enacted that male apprentices should be bound out by the parish till the age of 24; yet a binding till 21 was held to confer a settlement—for the statute is only directory in this respect.

In *R.* v. *Lonsdale*, 1 Burr., 447, Lord Mansfield says, there is a known distinction between circumstances which are of the essence of the thing required to be done by an act of Parliament, and causes merely directory.

In *Bank of the Northern Liberties* v. *Cresson*, 12 Serg. & Rawle, 314, the court recognize this distinction, and say: Under our land laws, the act of assembly directs the surveyor to run and mark the lines on the ground, and further enacts, that all surveys made before the warrant authorizing it comes to his hands, shall be accounted clandestine, and shall be void and of no effect. The first injunction is directory, the latter provision is imperative and peremptory.

In *Bank of the United States* v. *Dandridge*, 12 Wheat. 81, there are many cases where an act is prescribed by law to be done, and record made thereof, and nevertheless, if left unrecorded, the act is valid. By the English Marriage Acts, registers of marriages are required to be kept in public books in every parish, and signed by the parties and the minister, and attested by two witnesses. Yet it has been decided that such an entry is not necessary to the validity of the marriage, and that an erroneous entry will not vitiate it. If a regulation be merely directory, then any deviation from it, though it may subject the officers to responsibility, &c., cannot be taken advantage of by third persons.

In Dwarris on St., 716, the same doctrine is cited.

19 Wendell, page 135, *Mohawk and Hudson Railroad Company*.

19 Wendell, page 630, *Chenung County Insurance Company*.

*Larue & Whitaker*, for defendant:

This suit is brought to recover from defendant a sum of money for the benefit of the New Orleans, Opelousas and Great Western Railroad Company, and the New Orleans, Jackson and Great Northern Railroad Company. The plaintiffs claim that it is a legitimate tax which the defendant is bound to pay—and it is either a tax, a forced expropriation of private property for the benefit of two private corporations, or a forced subscription to the stock of said corporations—at all events, it is taking the property of the individual for public or private uses. Whichsoever of these it may be, there can be no doubt that the law, if any, under which the claim is made, should, on the part of the plaintiffs, have been strictly complied with before any judgment could be rendered in their favor. *Hiriart* v. *Morgan*, 5 L. R. 45. *Winchester* v. *Cain*, 1 R. R., 424. *Morris* v. *Croker*, 4 L. R. 150.

The last quoted case was one in which the validity of a title under a sale for taxes was involved, and the court remarks: "It was a sale for taxes, and in such sales, according to the principles of jurisprudence established by several decisions of the Supreme Court of the United States, and which prevail generally in the several States of the Union, the purchasers are bound in order to give force and validity to their titles, to show that all the formalities required

by law in alienations of this kind, have been fully and faithfully complied with. These principles we consider to be founded in justice and sound policy. Sacrifices of property of great value are frequently made in consequence of slight inattention of owners or their agents, by officers of the government in the collection of taxes, and avarice and immoral cupidity often lead purchasers to avail themselves of advantages acquired under legal pretexts, contrary to the moral precept which requires men, to act towards their neighbors as they would think just towards themselves under similar circumstances."

If this principle be true of sales for taxes, it is equally true of the act of taxation itself; for it would matter but little how a sale took place, or the judgment upon which it is founded were obtained, if the original exercise of the taxing power was in violation of right and law. The Constitution of the State directs how taxes shall be imposed by the general assembly—the charter of New Orleans is equally explicit in relation to taxation in the corporation. If one or the other should pass an act or an ordinance imposing taxation violating the organic law or the city charter, could the court give any effect to such acts? Is this railroad tax, as it is called, different from any other, in such matter as takes it out of the general and just rule?

The tax, or whatever it may be, is claimed under an Act approved March 12th, 1852, allowing police juries and municipal corporations, &c., to subscribe to the stock of corporations for internal improvements. But the 3d section of that act declares, " that no ordinance passed under the provisions of this act shall be valid or take effect, until it shall have been approved and ratified by a majority of the voters on whose property the tax is proposed to be levied, at an election to be held specially for that purpose, by order of the police jury or municipal corporation passing the ordinance ; and the said police jury or municipal corporation shall prescribe the manner of holding such election, and shall cause to be furnished to the commissioners of the same, a properly certified list of the voters," &c.

This section should be so construed, " that no clause, sentence, or word in it, be superfluous, void or insignificant." *Reynolds* v. *Baldwin*, 1 An. 166.

And being so considered, what does it require?

1st. That the ordinance should be approved and ratified by a majority of the voters upon whose property the tax was proposed to be laid—that is, a majority of the owners of real estate in the city of New Orleans, otherwise entitled to vote.

2d. That such voters, so qualified, shall be designated to the commissioners by properly certified lists of their names.

The defendant contends that neither the one nor the other of these prerequisites, without which the ordinance is null, and of no effect, has been complied with.

It appears to the counsel for the defendant, that these certified lists which the law requires, were not an unmeaning and insignificant form. That they were intended for something more than to employ a certain number of agents in their preparation ; that, indeed, they were meant to be a guide to the commissioners in the reception of votes ; that they should have been carefully prepared by the proper assessors of the city, by an enumeration of the voters, and by ascertaining which of such voters were owners of real estate, and properly certified according to law, and that when so prepared, they should have been used as any other registry of voters, by the commissioners of the election. It might be well assumed, that the course above indicated, is the only way in which it could be determined who were properly voters under the law, but whatever opinion may be entertained on that point, it is apparent that this certified list of voters owning real estate, was the sole security which the property holders of New Orleans had against perjury, fraud, and what many of them deemed oppression. It was the sole means by which they could ascertain the right of persons to vote away their property for the benefit of corporations, the existence, objects and management of which, they might not approve. The law designated no other. It is therefore respectfully urged that the list as required by law, should have been made and furnished to the commissioners of the election, and that they should have acted upon it, and that its not having been done, vitiates the whole proceeding. It is true that the preparation of such a list would have required some time and labor, and the railroad ordinance might not have passed with railroad speed, if passed at all,

but that is no reason why the prerequisite conditions imposed by the law to give it efficacy, should not have been complied with.

OGDEN, J. (SPOFFORD, J., not taking part in the case.) The 3d section of the Act of the Legislature of 1852, providing for the subscription by the parishes and municipal corporations of the State to the stock of corporations undertaking works of internal improvements, is in the following words:

"That no ordinance passed under the provisions of this act, shall be valid or take effect, until it shall have been approved and ratified by a majority of the voters, on whose property the tax is proposed to be levied, at an election to be held specially for that purpose, by order of the police jury or municipal corporation passing the ordinance; and said police jury or municipal corporation shall prescribe the manner of holding such election, and shall cause to be furnished to the commissioners of the same, a properly certified list of the authorized voters; and such election shall be preceded by a notice of thirty days, published in one or more newspapers in the parish or municipal corporation where such election shall be held. Provided, however, that if such ordinance shall be rejected by the majority of the voters, it shall be lawful, at any subsequent period, again to take the sense of the voters, in the same manner as at the first election, and at intervals of not less than six months."

The defendant being sued for the tax levied on her property, to meet installments due by the city on their subscription to the stock of the New Orleans, Jackson and Great Northern Railroad Company, and of the New Orleans, Opelousas and Great Western Railroad Company, in conformity with an ordinance of the common council, resists the payment on several grounds, as set forth in an original and supplemental answer. There are three grounds taken in the answer first filed, to wit:

1st. "She denies that the city has ever subscribed to the stock of the railroad companies aforesaid.

2d. "That if it has so subscribed, she denies that it has any authority of law to do so, and that all its acts, in relation to said pretended subscription if made, are null and void.

3d. "That if it has made any such subscription, that she is neither in law nor in equity liable to pay any portion thereof."

The defence, so far, extends only to a denial that there was any subscription to stock by the city, and of the existence of any law and of any ordinance of the council, authorizing such subscription. The subscriptions to the stock of both companies, by two separate ordinances, and the acceptance of those subscriptions by the companies, are shown by the evidence, and the real defence relied on by the council, is that contained in the supplemental answer, and is expressed in the following words: "That under the city's subscription alleged, if any such exist, she (the defendant) cannot in any manner or form, be held liable to the said city of New Orleans, inasmuch as it does not appear that said municipal corporation 'caused to be furnished to the commissioners of the election, to be held under the provisions of the Act of the Legislature, approved March 12th, 1852, a properly certified list of the authorized voters,' as said corporation was bound to do, in order to the validity of the ordinances referred to in plaintiffs' suit; or, in fact, that said corporation furnished any list whatever to said commissioners, that satisfied the provisions of said law, but that, on the contrary, many hundreds of persons voted at the

said election, who were not the owners of real estate, who were not on the assessment rolls as such, and who were not on any list, however defective, which may have been furnished to the commissioners by said corporation, and that the whole election is therefore null and void."

As it is not alleged in this answer, and is not shown by the evidence that a sufficient number of illegal votes were received to affect the result of the election, the defence may be considered as resting on the alleged failure of the municipal corporation to cause to be furnished to the commissioners of the election, a properly certified list of the voters, which it is contended was a prerequisite by the Act of the Legislature to the validity of the ordinance, and the election to be held under it.

It is our duty to ascertain the intention of the Legislature, and to give effect to it; if it was their intention, according to a fair and liberal construction which we are bound to give to an act passed by them, with a view to the accomplishment of great public good, by the promotion of internal improvements, that the furnishing a properly certified list of the authorized voters to the commissioners, should be a condition precedent to the validity of the election, and such list was not furnished, then it would be our duty to pronounce the election null and void. If, on the other hand, that clause in the act, according to such construction, ought to be viewed as merely directory, we should be usurping the power of the Legislature by declaring a consequence to follow from the omission to comply with their direction, which they did not think proper to declare themselves; and which, if such had been their intention, it was their duty to have expressly declared, unless from the nature of such preceptory clause in the law, such intention was sufficiently manifest without being declared. The intention of the Legislature is expressed in this section of the act, that the ordinance shall not be valid, until it shall have been approved by a majority of the voters on whose property the tax is to be levied, at an election to be held for that special purpose, by order of the corporation; that part of the law is prohibitory—the corporation are prohibited from enforcing the ordinance for the collection of the tax, until they had caused the same to be approved by a majority of the authorized voters, at an election to be ordered by them—it is a prohibition made in the interest of the tax payers—and if it could be shown that at the election so held, unauthorized votes had been received to a sufficient number to have affected the result, the election, which resulted in favor of the tax, would be declared null, and a prerequisite of the law not having been complied with, the ordinance would not take effect.

Is the intention expressed in the same manner, or can such intention be reasonably inferred, that a failure to comply with the formality prescribed in the subsequent part of the section, of furnishing to the commissioners a certified list of the voters, should prevent the ordinance from taking effect, although approved and ratified by a majority of the votes cast at the election. The intention is not expressed by the Legislature, and from the nature of that part of the law which appears to us to be directory, such intention cannot be inferred on legal principles, applicable to the interpretation of statutes. The rule is, that when a formality is not absolutely necessary for the observance of justice, but is introduced to facilitate its observance, its omission, unless there is an annulling clause in the law, will not annul the act. Touillier, vol. —.

The object of the Legislature was to facilitate the observance by the com-

missioners of justice in regard to the admission or rejection of votes. The act does not say by whom the list of authorized voters should be certified. As no registry of voters existed, such list, no matter by whom certified, would only have furnished a partial guide to the commissioners, as there would necessarily have been many persons legally entitled to vote as owners of property, on whom the tax was to be levied, and whose names were not on the last assessment roll, which was the only official document from which any list could be made. A literal compliance with the law in that respect, was impracticable. The evidence shows that copies of lists of voters from the last assessment roll were furnished, and if this part of the law, which we consider as separate from that which contains a condition precedent, was not literally complied with, either because it was impracticable, or because the proper authorities neglected their duty. Considering it to be merely directory, we cannot construe that provision into a condition precedent. See case of *Whitney* v. *Emmet*, 1 Baldwin's C. C. R. 316.

It is therefore ordered and adjudged, that the judgment of the court below be reversed ; and that there be judgment in favor of the plaintiffs for the sum of four hundred and fifty-five dollars, with eight per cent. per annum interest thereon, from the 1st of July, 1853, until paid; and also five per cent. commissions, to wit, the sum of twenty-two dollars and seventy-five cents, to be paid to the Assistant Attorney of the city, and that the defendant pay the costs in both courts.

BUCHANAN, J., dissenting. The Act of 12th of March, 1852, section 3d, page 128, declares, that "no ordinance, passed under the provisions of this act, shall be valid or take effect, until it shall have been approved and ratified by a majority of the voters on whose property the tax is proposed to be levied, at an election to be held specially for that purpose, by order of the police jury, or municipal corporation passing the ordinance ; and said police jury or municipal corporation shall prescribe the manner of holding such election, and shall cause to be furnished to the commissioners of the same, a properly certified list of the authorized voters, and such election shall be preceded by a notice of thirty days, published in one or more newspapers in the parish or municipal corporation where such election shall be held."

The defendant being sued for the amount of two tax bills, assessed upon the landed estate in New Orleans, to meet the first installment of the city's subscription to the stock of the Opelousas and Jackson Railroad Companies, which subscription was made by ordinances of the 13th and 17th of May, 1852, pleads, among other defences, that the said subscriptions are not binding upon her, the ordinances in question not being valid, by reason of the city council or municipal corporation not having caused to be furnished to the commissioners of the election specially held to ratify said ordinances, a properly certified list of the voters authorized to vote at said election, as required by the 3d section of the Act of 12th of March, 1852, quoted above.

The plaintiff attempted to prove, that properly certified lists of the authorized voters had been furnished, but, as I think, has failed in so doing. There were, indeed, lists furnished to the different polls ; but the City Treasurer, Mr. *Garlund*, informs us what these lists were. He says, in substance, that he prepared a manuscript list of the landed proprietors under the ordinance of the council ; that he took the names from the assessment roll of 1851, which was the last made at the time of the election, the assessment roll of 1852 being not then completed; that from the manuscript list so made by him, the city

printer made printed copies, which the Treasurer sent to the commissioners of election at each poll. The original manuscript list, which witness preserved and which was produced on the trial, was not certified. Does not remember whether the printed copies were certified or not.

It is very clear that this witness does not prove that the lists furnished the commissioners, were certified to be correct.

As to Mr. *Crossman*, the Mayor, who was also examined on this point, although he commenced by saying that properly certified lists of the voters were furnished to each poll, yet on his attention being more especially directed to the subject, he declared his complete ignorance, personally, of the fact of the lists being certified, or if so, by whom.

The fact is, that the Mayor had nothing to do with the preparation of those lists. By the ordinance of the council referred to by Mr. *Garland*, and which was an ordinance made under the statute " to prescribe the manner of holding the election," it was made the duty of the City Treasurer "to prepare an alphabetical list of all persons paying taxes on landed estate in the city of New Orleans," and "to furnish a copy of said list for each precinct at which the votes are ordered to be taken, to the commissioners or inspectors of election."

The ordinance says nothing about the certifying of the lists. Accordingly, the Treasurer deposed, and the production of the list in the District Court showed, that he did not certify the original. And it is fair to presume, that the lists, furnished to the commissioners of election, which were printed copies of that original, were likewise uncertified. The evidence satisfies me that such was the fact; and the course of argument by the counsel for plaintiff appears to admit it. For the learned counsel have put the case to us upon the ground, that the clause of the statute requiring a properly certified list of the authorized voters to be furnished to the commissioners of election, is not an imperative clause, but simply directory; the effect of a disregard of which, was not to invalidate the election. In other words, that it was optional with the city corporation to obey it or not.

A leading case upon this point is *Rex* v. *Losedale and others*, 1st Burrow's Reports, page 445. In that case, Lord Mansfield said : "There is a known distinction between circumstances which are of the essence of a thing required to be done by an Act of Parliament, and clauses merely directory." The question at issue was, the legality of the appointment of five overseers of the poor in a parish, under the statute of 43d Elizabeth, which restricts the number to four. And the Court of King's Bench held, for reasons stated at length, that the *number* of overseers was not an *immaterial thing*, and therefore that the appointment was invalid; although the time and place of making the appointment *being immaterial*, the appointment would not have been avoided for want of complying with the statute in those respects,

Again, in the *Bank of the United States* v. *Dandridge*, 12th Wheaton, 81, Judge Story held the following language : "That some of the provisions of the charter and by-laws (of the Bank of the United States) may well be deemed directory to the officers, and not conditions precedent, without which their acts would be utterly void, will scarcely be disputed. *What are to be deemed such provisions, must depend upon the sound construction of the nature and object of each regulation, and of public convenience, and apparent legislative intention.*"

Accordingly, the books furnish us with various instances of courts refusing

to avoid acts which have been done under a statute, on account of the omis-
sion of formalities prescribed by the statute. Thus, in the case of the *Bank of
the Northern Liber ies* v. *Cresson*, 12th Sergeant & Rawle, 306, the Supreme
Court of Pennsylvania held, that a bond given by a surety of the first book-
keeper of a bank, was binding, although no bond had been given by the book-
keeper himself, as required by the by-law of the bank, made under authority
given by the charter. It is to be observed, however, that the decision of that
case was put expressly on the ground, that "the bank had an inherent right to
require security from their officers, by the very nature of the institution, with-
out any special authority either from the statute or by-laws. If both had been
silent, they still had this authority."

Again, in the case already cited, of the *Bank of the United States* v. *Dand-
ridge*, the Supreme Court of the United States intimated, that, had the charter
of the bank in terms required the approval of the securities of a cashier, by
the board of directors, to be in writing, (which it did not,) it would have de-
served consideration, whether such a provision ought to be deemed a *condition
precedent*, without which the act was void, or only directory."

And in two cases reported in 19th Wendell, pages 135 and 635, the Supreme
Court of New York refused to annul elections of directors of corporations, for
the want of an oath taken by the inspectors of election, although the charters
required an oath; grounding its decision principally upon a presumed acquies-
cence of the parties plaintiff, from their having made no objection at the time
of the election.

All these decisions are reducable in principle to the rule laid down by Lord
Mansfield; that the statute is to be considered as imperative in every particular
which is essential to the thing required to be done, and merely directory as to
those which are immaterial.

Tested by this rule, the injunction to furnish a properly certified list of the
authorized voters to the commissioners of election, in the statute under consi-
deration, is imperative and not merely directory.

The object of the election was, to take the sense of—not the whole mass of
legal voters—but of a particular class of voters, namely, those holding property
which the ordinance proposed to tax—landed property. This was clearly not
an ordinary election, nor was the test of qualification of those who presented
themselves at the ballot-box, the 10th Article of the Constitution alone. Some-
thing else was necessary, beside the voter being a free white male citizen, above
the age of twenty-one years, who had resided twelve months in the State, and
six months in the parish. That something, was the title to landed estate in the
the limits of the corporation; and the test of that special qualification was not
left to the discretion of the commissioners of election by the statute. It was
to be found in a document, which it was made the imperative duty of the cor-
poration to furnish to the commissioners, to wit, a properly certified list of the
authorized voters, or as more clearly expressed in the French text of the law,
"une liste dûment certifiée de *toutes* les personnes qui ont droit de voter audit
scrutin." It is plain, from the law, that this list was to guide the commission-
ers of election in receiving the votes. And the reason of the enactment is very
apparent. Had not the act provided some such guide, the commissioners
would have been obliged to require of every voter the production of his titles
to landed property, the examination of which would have caused endless de-
lays; for it is needless to say, that our law admits no other proof of title to land,

than written evidence. The tendering of an oath, therefore, which some of the witnesses tell us was the course adopted to some extent, at this election, was not only contrary to this particular statute, which was the law that controlled this election, but was a violation of the general law of evidence in Louisiana. The statute of 1st June, 1846, concerning elections, section 12, which authorizes and requires inspectors of election, at ordinary elections, to tender a certain oath to a person whose vote is challenged, is, upon its face, not applicable to an election under the statute of 1852. The properly certified list, that is to say, under the ordinance of the council, which made it the duty of the City Treasurer to prepare the list—a list certified correct by that officer, of all persons having the right to vote at said election—was indispensible for carrying out, legally and fairly, the object which the Legislature had in view in this election. Whether we adopt the rule of Lord Mansfield, or the less terse and intelligible rule of Judge Story, we are brought to the same conclusion, that the legislative injunction to furnish the certified lists of voters who were landed proprietors, was imperative, and the furnishing of such list, a condition precedent to the holding of a valid election under this statute, in default of which the ordinance subscribing to stock remained without effect.

Having thus expressed our opinion upon the provisions of the 3d section of the Act of the 12th of March, 1852, in relation to the imperative or merely directory effect of those provisions, as between the State and the city, it remains to consider their effect as between the city and the proprietors of landed property in New Orleans. It strikes me that the argument of plaintiffs has left out of view entirely, the very peculiar relations of those parties to each other under the Act of March, 1852, and the ordinances of May, 1852, which are nothing more than the application or consummation of that act.

The Act of 1852, authorizes any police jury or municipal corporation of this State, to subscribe to the stock of corporations undertaking works of internal improvement under the laws of this State. The second section provides that the subscription so made, shall be paid by the levy of a tax on the landed esstate situated in the parish or municipal corporation.

By the fourth section, it is declared that the stock thus subscribed for, shall not belong to, nor shall it even be administered by the police jury or municipal corporation subscribing; but shall belong to the tax payers, who shall have paid therefor. The tax receipt of each tax payer shall entitle him to a certificate of stock, for an amount equal to the amount of his tax paid, at the hands of the corporation to which subscription shall have been made, which certificates are to be transferable by delivery.

Is it not clear that under this law, the relative position of the city of New Orleans and its taxable inhabitants, the landed proprietors of that city, in relation to this matter, was that of agent and principal? The act invested the city with a mandate to subscribe for stock on account of the owners of land within its limits. The latter were bound by the terms of the law, to fulfil the obligation contracted by the former, as their mandatary. That obligation was the payment of money for stock subscribed. The amount of this pecuniary obligation, under the ordinances of May, 1852, was two per cent. of the assessed value of the property of the principal, in favor of the Opelousas Railroad, and three per cent. in favor of the Jackson Railroad Company. The city was without interest in the stock subscribed, and under no obligation to make good the subscription. The railroad companies could never have held the city

responsible in its corporate capacity, for they had distinct notice of the terms of subscription, and had personally accepted the same.

It is a general rule of the contract of mandate, that the principal is only bound to execute the engagements of his agent, conformably to the power which has been conferred. C. C. 2290.

A mandatary, under a special power, must confine himself strictly within the limits assigned to him, and those dealing with him must, at their peril, see that he does not exceed his authority, but they need not, in search of his powers and their limitations, look beyond the instrument of mandate. *Brown* v. *Frantum*, 6th La. Rep. 47.

In the present case, the instrument of mandate is the statute of 12th of March, 1852. The agent, the city, was bound to conform to the terms of that instrument, and the parties with whom the agent dealt, the railroad companies, were at their peril to see that he conformed to the requisitions of the same. In this point of view, the very argument of the plaintiff, that the clause requiring a certified list of all authorized voters was directory, militates in favor of the defendant. It admits at least, that the clause was not entirely without meaning. If it had not the effect of utterly abrogating the ordinance of subscription, at least it was a direction or injunction to the corporation, in regard to the formalities to be observed for the purpose of binding the party intended to be bound, the landed proprietor. If not a condition precedent, the omission of which imported the nullity of the ordinances by the terms of the statute itself, it was at least a condition subsequent, essential to the validity of the election held under the ordinances.

Whether viewed as a clause imperative, or a clause directory, a condition precedent, or a condition subsequent, in the construction of this statute, I am of opinion that the omission of the city corporation to furnish a properly certified list of the authorized voters to the commissioners of election, is equally fatal to the right of plaintiff to recover in this action.

Few statutes, perhaps, have been framed, so fruitful in points of construction, as this statute of 12th March, 1852. It has even been doubted, whether the impost upon landed property under it, be a tax at all—whether its proper designation be not rather an expropriation of property in favor of corporations chartered for the internal improvement of the State; or a forced subscription to stock. If we apply the definition of a tax recognized as correct by the Supreme Court, in 11th Martin, 324, *State* v. *Orleans Navigation Company*, and in 1st Annual, 115, *Second Municipality* v. *Morgan*, it is a misnomer to call the contribution of the landowners to the stock of the railroad companies, under this statute, a tax. That definition is as follows: " a burthen, charge, or imposition set on persons or property for public uses; exactions to fill the public coffers for the payment of the debt, and the promotion of the general welfare of the country." Accordingly, we have seen that the Legislature did not allow such a contribution to be levied by the sole action of the corporation of New Orleans, through its common council and Mayor; but required an additional sanction, the vote of those who were to pay the tax or contribution. In the contemplation of the Legislature, it was evidently an expropriation; and their object was to make it a voluntary one. That its effect is to expropriate property is, I think, undeniable. For it makes no difference in principal, that the expropriation is fractional—five per cent., or one-twentieth, instead of the whole. It is true, that the act, while it takes away with one hand, gives

with the other.    It presents the citizen with railroad stock in exchange for his
land.    But perhaps, individually, he was not desirous of such an exchange,
although a majority of the land owners in the city were.    As to this defendant,
it is certain that she never gave her consent, being a woman and disqualified to
vote.

This case appears analogous to that, of which there are many examples in
our reports, of the contribution required from riparian proprietors for making
levees in front of their property, with regard to which it has been frequently
decided that the proprietors are not liable, unless all the formalities of the law
have been strictly fulfilled.    *Hiriart* v. *Morgan*, 5 L. R. 45.    *Winchester* v.
*Cain*, 1 R. R. 421.    Two cases in 9th Ann. decided by Campbell, J.

The same thing has been decided with regard to forced alienations of land
for taxes.    In *Morris* v. *Crocker*, 4 L. R. 150, the Supreme Court said : " In
such sales, according to the principles of jurisprudence established by several
decisions of the Supreme Court of the United States, and which prevail gene-
rally in the several States of the Union, the purchasers are bound in order to
give force and validity to their titles, to show that all the formalities required
by law in alienations of this kind, have been fully and faithfully complied
with."

If it be competent and proper, after the alienation has been consummated
by a sale for taxes, to inquire into the manner in which the formalities required
by law for bringing about that sale have been fulfilled, it is equally proper to
put a stop to pursuits for the enforcement of taxes, if it appear that the legal
requirements for the imposition of the tax have been omitted.

Lastly, this action must abate, because the ordinances of May 13th and 17th,
1852, imposing the tax, have been repealed.    This appeal has taken place since
the judgment rendered in the court below, and since the appeal in this case ;
but we are not the less bound to take notice of it.    In *Cooper* v. *Hodge*, 17 L.
R. 478, Martin, J., delivering the opinion of the court, said : " The Judge *a
quo* was of opinion that on the repeal of a law, every proceeding begun but
not perfected under it, becomes absolutely void.    In this opinion we concur.
We have held, that if judgment be correctly given under a law which is re-
pealed *pending* the appeal, this court is bound to reverse it."    See also 12 L
R. 552.    13 L. R. 497.

The two Acts of Assembly, approved 15th of March, 1854, Nos. 108 and
109 of the Session Acts, authorized the city of New Orleans to subscribe to the
stock of the Opelousas and Jackson Railroad Companies, for identically the
same amount as the subscription contained in the city ordinances of the 13th
and 17th of May, 1852, that is to say, one million and a half of dollars to the
Opelousas, and two millions to the Jackson.    Those subscriptions were intended
to be substituted in the place of the previous subscriptions, as is proved by
the injunction upon the city council to repeal the ordinances of May, 1852, by
the same ordinances by which it shall make the new subscription.    It is also
ordered by the Legislature, that the railroad companies shall accept the new
ordinances of subscription, consequently renouncing the former subscription.
The new subscription is to be paid for by city bonds bearing interest ; and the
stock belongs to the city, not as before to the individual tax payers.

It is a matter of public notoriety, that the city ordinances of May, 1852,
have been repealed, and that new ordinances creating a new subscription of
stock, and repealing the former subscription have been accepted by the rail-

NEW ORLEANS
*v.*
ST. ROMES.

road companies. Of the city ordinances, I think it proper that we shall take judicial cognizance, without proof.

If it should be argued that the injunction to repeal the city ordinances of the 13th and 17th of May, 1852, is qualified in the Acts of March 15th, 1854, by proviso, that "the repeal of said ordinances shall not be so construed as to relieve the city from the obligation to collect and pay over to the railroad companies that portion of the railroad tax imposed under said ordinances, for the year 1853, which has not yet been collected and paid over to said company." There are two answers, the first of which, it is hoped, will be considered sufficient.

First, there can be no obligation to collect and pay over a debt which the creditor has extinguished by voluntary remission. And what else than a voluntary remission of the obligation of the landed proprietors to pay the subscription of 1852, was it, when the railroad companies, the obligees, accepted the repeal of the ordinances under which that obligation had its existence?

The second answer is, that it would be a spoliation disgraceful to the State of Louisiana, and which a court of justice could never sanction, that the land owners of the city of New Orleans, should be made to pay this tax, after the ordinance under which it was imposed, and under which alone they had a right to receive stock in exchange for their payment, was repealed. For it is vain to suppose that they would have a right to the stock under the Act of the 12th of March, 1852. That act is general in its terms, not sanctioning or guaranteeing any subscription in particular. To give any force or effect to the insidious proviso which deforms the fifth paragraph of the second section of the Acts of the 15th of March, 1854, would be to sanction a law that impairs and destroys the obligation of a contract, because it frees one contracting party while it keeps the other bound. The law of 1852, and the city ordinances of that year, accepted as they were by the railroad companies, constituted the contract between the railroad companies and the defendant; a contract in which she should be the more protected, because it was one forced upon her. The advantages, such as they were, which this compulsory contract afforded her, are withdrawn; the contract is arbitrarily cancelled to that extent, by the State Legislature which had already forced it upon her. Yet what was onerous to her, her obligation to pay, is left in full force. The unconstitutionality of the proviso is self evident.

I am of opinion that the judgment of the District Court should be affirmed.