(59 South. 769.)

No. 19,633.

ANDREWS v. BLACKMAN.

(Oct. 3, 1912.)

*(Syllabus by Editorial Staff.)*

1. ELECTIONS (§ 158*)—CONTEST—EFFECT OF IRREGULARITIES.

Irregularities in the conduct of a primary election such as the failure of election officers to sign or forward a particular document in a particular manner, or failure to provide the elector a booth of particular dimensions, particularly situated, or constructed of particular material, not preventing a free and honest expression of the will of the voters, will not affect the validity of a nomination at the election.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 123; Dec. Dig. § 158.*]

2. ELECTIONS (§ 158*)—CONTEST—EFFECT OF IRREGULARITIES.

Act No. 198 of 1912, § 2, amending Act No. 49 of 1906, § 1, providing that any nominations, except as therein provided, shall be illegal, and the Secretary of State is prohibited from placing on the official ballot the name of any person, as a candidate for any political party, not nominated in accordance with the provisions of the act, does not invalidate a primary election, because of irregularities in its conduct which do not prevent a free expression of choice by the voters.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 123; Dec. Dig. § 158.*]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; G. H. Couvillon, Acting Judge.

Contest by James Andrews of the nomination of Wilbur F. Blackman at the primary election for the judgeship of the Thirteenth judicial district. From a judgment for the defendant, plaintiff appeals. Affirmed.

Andrews & Hakenyos, Hundley & Hawthorn, and R. H. McGimsey, all of Alexandria, for appellant. Blackman & Overton, Mims & Dawkins, T. A. Carter, and H. B. Gist, all of Alexandria, for appellee.

Statement of the Case.

MONROE, J. At a Democratic primary election held in the Thirteenth judicial district on September 3d of this year, plaintiff and defendant were opposing candidates for the nomination to the judgeship of the district court, and it having been made to appear, through the promulgated returns, that defendant had received a majority of the votes cast, and was therefore the nominee, plaintiff instituted this suit and contest, on the grounds (stated in substance):

That no set of returns of the election were delivered by the commissioners to the chairman of the Democratic committee of the district, and no effort to obtain such a set was made by him; that the chairman did not convene the committee to receive the tabulation of, together with, the said returns, and that neither he nor the members of the committee were present at the place of meeting at the appointed time; but that, late in the afternoon of September 7th, certain persons, holding proxies from said chairman and members, assembled as, and assumed to discharge the functions of, the committee; that

the committee, as thus composed, obtained, from the office of the sheriff of Rapides parish, certain papers purporting to be returns from several boxes in Grant parish (the district, it may be stated, being composed of the parishes of Rapides and Grant), but, finding that other returns from Grant parish, and all the returns from Rapides were missing, adjourned until September 9th, in order to get them, and then obtained an order from the judge of the district court (defendant herein) authorizing them to get the ballot boxes, containing the returns from the several precincts of the parish of Rapides; that having procured and gone into said boxes, and having obtained the missing returns from Grant parish, said committee tabulated the votes and promulgated the result of their work, showing that defendant had received 1,609 votes and plaintiff 1,302, and declaring defendant the nominee; that all the proceedings thus set forth were illegal and void for this: That the law requires a sealed set of the returns to be delivered to the chairman of the committee in person, requires the chairman to tabulate same and present his tabulation, with the returns, to the committee, and confines the committee, in the discharge of its functions, to said tabulation and returns; that there could be no meeting of the committee without the chairman, and no meeting where the members were not actually present, but were represented by proxies; that the judge of the district court, being himself a candidate, could make no order pertaining to the count or promulgation of the result, and should have recused himself; that no returns were made from Rapides parish, and no tally sheets were made or sworn to, as the law requires, or delivered to any one authorized to receive them; that the returns from Grant parish, which were obtained by the committee, had been for several days in the hands of unauthorized persons; that at Verda, Montgomery, Georgetown, and Pollock sample ballots were willfully given by the commissioners to voters desiring to vote for contestant, with the intention of perpetrating irregularity and fraud; that no booths for the preservation of the secrecy of the ballot were provided at any of the precincts in either parish; that at Woodsworth, Forest Hill, Lecompte, Gum, Hineston, Union Church, Tioga, Bell, Borland, and Lena, in Rapides parish, all voters were interfered with by unauthorized persons, "many of whom went inside the guard rail and into the booths with the voters and insisted on marking the voter's ballot"; that no polling places were designated by the parish committee, or published, in either parish.

The contestant further alleges that, should the court not decree the nullity of the election, he should be awarded the necessary certificate, and that his name should be placed on the official ballot, as the nominee, for the reasons that no polling places were designated or published in the parish of Rapides; that sample ballots were illegally and fraudulently used and counted in the parish of Grant; that voters were illegally and fraudulently hindered and interfered with; that the returns from different precincts in Rapides parish contained no tally sheets, and such as were returned were unsigned and unsworn to, especially those from Forest Hill, Gum, Hineston, Union Church, Welchton, Lecompte, Hammond, Cheneyville, Echo, and Tioga, and that the same is true as to the returns from Grant parish, and especially those from Montgomery, Verda, Georgetown, Pollock, Lincecum, and Antonio; "that those boxes, in both parishes after having been either thrown out or purged of the frauds committed thereat, by a recount of the votes, will show a clear majority for petitioner over said Wilbur F. Blackman, and entitle him to be declared the nominee at said election."

The prayer of the petition is:

"That there be judgment decreeing that said primary election is null and shall have no effect as to the declaration of the name of the nominee and the placing of the nominee's name on the official ballot, or, in the alternative, that the boxes and votes be purged of the irregularities and frauds, as alleged in the petition, and that a recount thereof be ordered, and that your petitioner be declared the nominee of the Democratic party for judge of the Thirteenth judicial district, * * * and ordering that his name be placed on the official ballot as such nominee."

The contestee (being the judge of the court in which the suit was instituted) recused himself and appointed Judge Couvillon, of an adjoining district, to hear and determine the case, and that officer, after ruling upon some interlocutory matters and hearing the case on its merits, gave judgment for the contestee, from which the contestant prosecutes this appeal. Among other matters ruled on prior to final judgment was an application by the contestee for a recount of the ballots, which, with the acquiescence of the contestant, was granted—two experts, named by each litigant, from each parish, being appointed to make the count, and the count for each parish being required to be made in the presence of the clerk of the court, or his chief deputy, and two witnesses, which was done accordingly.

The report as to the parish of Rapides shows that no sample ballots were cast in that parish; that there were 932 (white) ballots cast for contestant and 1,206 (white) ballots for contestee, and 5 (white) ballots that were doubtful—two of them being marked or stamped to the left, instead of in the square to the right, of the contestant's name, two being similarly marked to the left of the contestee's name, and one being marked in the square to the right of the contestee's name, but having the name of the contestant defaced or marked over with a pencil. The report as to the parish of Grant shows that 246 white ballots and 118 yellow (sample) ballots were cast for the contestant, 307 white ballots and 94 yellow (sample) ballots for the contestee, and 4 ballots that were doubtful, of which upon one there is no mark or stamp opposite the name of either candidate, upon another there is a mark in the square to the right opposite each name, but the mark opposite the name of the contestee is scratched over with a pencil, upon the third there is a distinct round spot or stamp opposite the name of the contestant, and a distinct mark, in the same ink, but not round, opposite the name of the contestee, and upon the fourth ballot there is no mark or stamp opposite the name of either candidate. The reports were, on motion approved, though the contestant interposed some objections—one of his grounds being that the boxes at Colfax, Fairmount, Bagdad, Bruce's Mill, Dry Prong, Creed, and Buckelew, in Grant parish, and Holloway, Glenmora, Elmer, Horn's, Boyce, Weil, Pineville, and Quadrate, in Rapides, were not, and are not, in contest. Upon the trial of the case the following admissions were placed of record:

### Grant Parish Admission.

"It is admitted by plaintiff and defendant that the ballots throughout the various voting precincts in Grant parish were, after being counted, placed in each ballot box at each voting precinct, and each ballot box sealed by the commissioners and delivered by the commissioners to each proper returning officer and one commissioner, and delivered by them, so sealed, to the clerk of court of said parish of Grant, where they have remained in his possession until now, and that said ballot boxes and said ballots, from the time that they were counted and placed in each sealed ballot box until the present time, have not been altered or changed or tampered with in any respect, and that the election at each precinct was held at the usual polling or voting place, and no voter was deprived of his right to vote through ignorance of the voting place."

### Cheneyville Admission.

"It is admitted by plaintiff and defendant that all the ballots cast for the office of judge in the primary election in contest at Cheneyville precinct, in the parish of Rapides, were correctly counted by the commissioners, and,

after being counted, were placed by the commissioners in the ballot box, and the ballot box sealed by the commissioners and delivered by the commissioners to the returning officer and to one commissioner, and by said returning officer and commissioner delivered to the clerk of court of said parish of Rapides, at the clerk's office in Alexandria, in said parish of Rapides, where the same has been kept in his custody ever since, and that from the time said ballots were counted and placed in said ballot box to this time said ballots and said ballot box have not been changed, altered. or in any wise tampered with, and that said election at said precinct was held at the usual voting place and no voter was deprived of his opportunity to vote through ignorance of the location of said polling place. This admission to be hereafter known and referred to as the 'Cheneyville Precinct Admission.'"

### Lecompte Admission.

"Same admission made as the Cheneyville admission, with the additional admission that the election was legally held and conducted, and returned and counted."

### Rapides Parish Admission.

"It is admitted by the counsel for the plaintiff and defendant, both that no ballot boxes were ever tampered with after they were handed in to the hands of Capt. Calvit, clerk of court, and that no ballot or tally sheet or return was altered or changed while in the possession of said clerk of court."

*       *       *       *       *       *       *

The same admissions, as in the cases of Cheneyville and Lecompte, were made as to Boyce, Echo, Forest Hill, Big Island, Alexandria, Weil, Quadrate, Glenmora, Union Church, Pineville, Welchton, Borland, Poland, and Hammond, thus including all the precincts in Rapides parish except Lamourie, Woodsworth, Elmer, Hineston, Gum, Horn's, Lena, Holloway, and Tioga; and, as the contestant, in opposing the approval of the report of the experts, alleged that the boxes from Holloway, Elmer, Horn's, Glenmora, Boyce, Weil, Lena, and Tioga were not in contest, the only boxes which are left in dispute (in Rapides parish), save as to matters not included in the admissions, are those from Lamourie, Woodsworth, Hineston, and Gum, with reference to which the evidence is about as follows:

Provision was made whereby the voter was afforded the means of preparing his ballot in secrecy. Thus, at Lamourie, he could go into an adjoining room; at Woodsworth, part of the room in which the voting took place was screened off with a curtain; at Hineston, there was a separate room; at Gum, one end of a gallery was separated from the other end, where the voting was done, by means of a suspended blanket. The testimony of all the witnesses, whether for contestant or contestee (and there are quite a number), practically concurs to the effect that there was no fraud, no intimidation, no overlooking of voters who were preparing their ballots; that the votes were counted and entered on the tally sheets; that the ballots were replaced in the boxes, with the tally sheets and poll lists; that the boxes, having been sealed, were delivered to the returning officers, and by them delivered to the clerk. But one witness (Lester Swan) testifies that any one saw how any voter marked his ballot, and, from his testimony, it appears that he made attempts of that kind at Gum precinct; but he was unable to name any voter whose ballot he had seen, or to say how any ballot was stamped or marked.

The contestant has alleged (in his opposition to the approval of the report of the experts) that the boxes at Colfax, Fairmount, Bagdad, Bruce's Mill, Dry Prong, Creed, and Buckelew, in Grant parish, are not in contest. The other precincts in that parish are Pollock, Simms, Antonio, Lincecum, Georgetown, Summerfield, Verda, and Montgomery, and, as to them, it is admitted (in the general admission with regard to Grant parish which has been quoted) that the ballots, after being counted, were placed in the ballot boxes, and that the boxes were then sealed and delivered by the commissioners to the proper returning officers and one commissioner (for each box), by whom they were de-

livered, "so sealed," to the clerk of the court, in whose custody they remained; that said ballots had not been altered, changed, or tampered with from the time that they were counted and put in the boxes; that the elections were held at the usual polling places, and that no voter was deprived of his right to vote through ignorance of the polling place. We find no oral testimony in regard to Verda, though in view of the confused mass of papers of which the record is composed, and the short time allowed for this examination, it may have escaped our search. For the rest, the witnesses concur to the effect that there was no fraud, intimidation, overlooking of voters in the preparation of their ballots, or other unfair doings.

The total vote of the parish was cast as follows:

Total white ballots for contestant.........246
Total yellow ballots for contestant........118
Total white ballots for contestee..........307
Total yellow ballots for contestee.......... 94
Doubtful ballots........................ 4
                              ———
   Total ..........................769

H. P. Gray, a commissioner of the Pollock precinct, where 33 yellow ballots were cast for the contestant and 44 for the contestee, testifies that those ballots were received because the voters objected to the numbers on the detachable slips forming part of the white ballots, being under the impression, no doubt, that they would serve to identify the voter with his ballot, whereupon the commissioners, ignorantly, but innocently, told them that they could vote the other ballots, which had no numbers or slips attached to them. There was, however, no intention, either at Pollock or any other precinct, thereby to favor the one candidate or prejudice the other. And the same thing may be said of the failure of the commissioners to sign and swear to the tally sheets, and to forward one set of returns to the chairman of the judicial district committee, whether in Grant parish or Rapides; those omissions having occurred as well in cases where there were majorities for the contestant as where the majorities were in favor of the contestee. On the whole, we are satisfied that the election was fairly conducted; that the result as promulgated represents the declared wishes of a majority (by some 300) of the qualified electors who participated therein; that no one who desired to vote, and was entitled so to do, was deprived of that privilege by reason of any action of the officers conducting the election; and that, if all the errors shown to have been committed were corrected, and all the omissions supplied, the result would be the same—the contestee would still be entitled to the nomination.

### Opinion.

[1] The general and long-established rule in this state, applicable to cases such as this, has been that it is the casting of the ballots, by the legally qualified electors, unimpeded by force or fraud, which determines the result, and we do not find that rule to have been abrogated by the legislation of recent years regulating the conduct of primary elections. The parties concerned in a primary election, as in any other, are the community to be affected, the electors who participate, and the candidates. The officers charged with its conduct are merely agents, whose duty it is to facilitate the electors in the free and fair expression of their will, and where that has been accomplished it would be unreasonable to hold, in the absence of an express provision of law to that effect, that the interest of the community shall be sacrificed, the will of the electors set at naught, and the results, as to the candidates, defeated, because, in its accomplishment, or after its accomplishment, the agents under whose direction the election had been held, have failed to follow each

and every formal direction prescribed for their guidance. The view thus expressed finds support in many adjudged cases, including among others, the following: Moyer v. Van De Vanter, 12 Wash. 377, 41 Pac. 60, 29 L. R. A. 670, 50 Am. St. Rep. 900; Lucky et al. v. Police Jury et al., 46 La. Ann. 679, 15 South. 89; Madere v. Sellers, 120 La. 812, 45 South. 735; Ross v. Naff et al., 130 La. 590, 58 South. 348; City of New Orleans v. De St. Romes, 9 La. Ann. 573; Burton v. Hicks, 27 La. Ann. 507; Augustin v. Eggleston, 12 La. Ann. 366; Webre v. Wilton, 29 La. Ann. 610; Duson v. Thompson, 32 La. Ann. 861, 871; McKnight v. Ragan, 33 La. Ann. 398. If the framers of the existing statutes regulating primary elections had intended that such elections should be decreed of no effect, notwithstanding that a free and honest expression of the will of the voters may have been obtained, merely because some election officers, either during the progress of the election or after the fact, failed to sign or forward a particular document in a particular manner, or because such officers failed to provide for the elector a booth of particular dimensions, particularly situated, or constructed of particular material, in which to prepare his ballot, they would, no doubt, have found language in which thus to provide a punishment of the innocent for the dereliction of the guilty; but we do not find such language in the existing statutes, and we have neither the authority nor the disposition to supply it.

[2] Section 2 of Act 198 of 1912, amends section 1 of Act 49 of 1906, so as to make it read (in part):

"That the dominant * * * party * * * shall make all nominations * * * by a direct primary election. That any nomination, * * * except as herein provided, shall be illegal, and the Secretary of State is prohibited from placing on the official ballot the name of any person, as a candidate for any political party, not nominated in accordance with the provisions of this act."

It seems to us, however, that the provision thus quoted has no bearing upon the question whether a primary election shall be avoided and annulled for the nonobservance of directory provisions of the law, when such nonobservance in no manner affects the fact that the electors entitled so to do have, in that manner, expressed their choice of a candidate. It would, perhaps, not be going to an extreme to say that, if no election is to be regarded as valid unless every person having any function to discharge in connection with it shall discharge such function according to the letter of the law, there will never be a valid election, unless it be confined to a very few well-informed persons. The learned counsel for the contestee, in his oral and printed argument, has presented a question of jurisdiction, based upon the proposition that, under the statute which we are now considering, the right to contest an election is conferred only upon a candidate "who shall claim to have been nominated," and that the contestant before the court, in view of the evidence adduced, has abandoned all such claim, and hence has no standing in court. The contestant has not, however, placed his abandonment of record, and the closing argument of his counsel was by no means definite to that effect. We have, therefore, thought it advisable to deal with the case as we have done, though regretting that we should be compelled to do so under pressure, by reason of the inadequacy of the time allowance imposed by the statute.

For the reasons thus assigned, the judgment appealed from is affirmed.