Statement of the Case.
MONROE, C. J.
Plaintiff, having been a ■candidate in the late primary election for the Democratic nomination to the office of parish assessor, entered his protest before the parish Democratic executive committee against the reception and consideration of the returns from the First, or “Sandy Ford,” precinct of the Second ward, and, the protest having been overruled, he entered this contest in the district court (as provided by section 6 of Act 198 of 1912), setting up various grounds of complaint, of which several have been abandoned; that now insisted on being that, upon the tally sheet that was returned to the committee, it appears, in writing, that defendant received 117 votes and he (plaintiff) 79, and, in figures, that defendant received 122 votes, and he (plaintiff) 74; and that the committee had no authority to determine which of the two showings was correct, but should have declined to consider the returns from the “Sandy Ford” precinct and hav,e declared plaintiff the nominee, since the elimination of the vote there cast would leave him with a majority, according to the returns from the other wards and precincts of the parish. In the alternative, he prayed that, .should the court consider the vote at “Sandy Ford” precinct, the returns be disregarded, the box opened, and the ballots counted.
Defendant’s contention was that the apparent discrepancy between the writing and the figures on the tally sheet was attributable to the inexperience, want of skill of, and unfavorable conditions which surrounded, the officers by whom the election was held; and that the figures, 122 and 74, respectively, in the right-hand column of the tally sheet, show the correct vote. And he alleges, in reconvention, that, in another precinct, 11 persons voted for plaintiff, who were ineligible by reason of nonresidence in the precinct; that another so voted who had resided for more than a year in the parish of Tangipahoa; that, in still other precincts, two qualified electors, who would have voted for him, were illegally denied the right to vote; and that, in still another, a person who was disqualified for nonpayment of his poll taxes was allowed to vote for plaintiff.
It appears from the evidence that the voting at “Sandy Ford” precinct was done in a room, the dimensions of which were about 12x16 feet; and that the work of compilation and tabulation was conducted in the same room during the entire night following • the election, by the commissioners and clerks, in the presence of, perhaps, 15 or 20 other persons, watchers or friends of the plaintiff and defendant, and of candidates for other offices; that the election officials, or some of them, were inexperienced in such matters and were more accustomed to the use of plows than pens; that they worked by candle light until the candles burned out, and then by the light of pine torches, and, finally, at 5 o’clock in the morning, after the returns showing the result of the election, as to the parish officers, were completed, and the result publicly announced, they locked the box and proceeded with it, and with the box containing the ballots for the candidates for state offices, to the parish seat (Covington), where the returns, as to the candidates last mentioned, were completed.
There were three poll lists and three tally sheets kept (on the vote for parish officers), and they were all locked in the box until the officials reached Covington, when the box was opened, and one set (poll list and tally *855 sheet) was taken out and mailed to the Secretary of State, one set delivered to the Democratic parish committee, and the third set, with the box (which was then sealed, as well as locked), delivered to the clerk of the court (the tally sheet delivered to the clerk being referred to in some of the testimony as “spoiled,” but having, nevertheless, been completed so far as the marking and tallying of the votes were concerned). The original sheets that were delivered to the chairman of the committee and the clerk have been brought up with the record, together with a certified copy of that which was sent to the Secretary of State.
They are divided, longitudinally, into four columns, bearing the headings, respectively:
'Officers and Names Clerk -will write title of office and names of candidates as they ap pear on ballot. Tally Amount of votes in letters Amount of votes in figures.
Counting the marks, tallied and untallied (‘¡lUf, 11”), on the certified copy furnished by the Secretary of State, we find that the additions correspond with the figures, 122 and 74, which purport to show the total number of votes cast for plaintiff and defendant, respectively ; no entry appearing in the column headed “Amount of votes in letters.” Counting the marks, tallied and untallied, upon the sheet which was delivered to the chairman of the committee, we find that they number 125 for defendant and 74 for plaintiff, though the last four marks for defendant are not crossed with the “tally,” and there is an additional, or fifth, mark which looks as though it may have been accidental. The figures in the column on the extreme right of the sheet are 122 and 74, respectively; but in the column headed “Amount of votes in letters” there appear, in writing, the words “one hundred” and what seems to have been intended for “seventeen,” opposite the figures 122, and for “seventy-nine,” opposite the figures 74. Adding the marks, tallied, and untallied, on the sheet that was delivered to the clerk, we find that they number 126 for defendant and 74 for plaintiff, that the figures in the right column are 122 and 74, respectively, and that there is no entry in the column headed “Amount of votes in letters.”
The committee gave plaintiff the benefit of any doubt that might have existed in their minds, in either direction, by crediting defendant with the lowest, and crediting him' (plaintiff) with the highest, number of votes that could possibly be attributed to either of them, on the face of the tally sheet upon which their findings were based; that is to say, they allowed defendant 1Í7 votes, though the marks and tallies called for 125, and the figures in the right column for 122, and allowed plaintiff 79 votes, though the marks and tallies and the figures in the right column called for but 74 — all of which made a difference of 9 votes against the defendant, thereby reducing his majofity (of 11) to 2 votes, though that result was probably unknown to the committee at that time. The district court was, however, of opinion that the returns were too uncertain and conflicting to furnish a basis for any finding, and, over defendant’s objection, permitted the ballot box to be opened and the ballots counted; as the result of which the conclusion was reached that defendant had received 105 votes at “Sandy Eord” precinct and plaintiff 86, and that, in the entire parish, defendant had received 1,078 (instead of 1,088) votes, and plaintiff 1,083 (instead of 1,077), and that plaintiff was therefore the nominee. Counsel for defendant stated that he had no objection to the opening of the box and the introduction of the ballots that might be found therein, provided it were first shown that the box had not been tampered with and that opportunity for tampering with it had not been afforded, but the court ruled that the burden rested upon defendant to show, *857 affirmatively, that the box had been tampered with or was left in a position to have been tampered with, and considerable testimony was adduced on that subject, from which we find, as follows, to wit:
The box was delivered to the clerk, locked and sealed; that is to say (as to the sealing), a piece of paper was extended from the top of the lid over to the front of the box and was sealed, with wax, at one end upon the surface of the lid, and at the other end upon the surface of the front of the box, so that the lid could not be raised without severing the paper or loosening the seals, either from one end or the other. And it was brought into court with the seals loosened from one end. The clerk placed the box, or had it placed, when it was delivered to him, in a room adjoining his office, as clerk and ex officio register of conveyances and recorder of mortgages, which room is called a vault, and measures about 14x16 feet, has a window opening outside, is separated from the main office by a passage 3 feet wide by 6 or 8 feet in length, and is as much open to the public as the main office, save that the door leading from it into the main office is usually locked at night and the window is protected by iron bars. Beyond the fact that the box was put in the vault, the clerk knew no more about whether it had been tampered with than any other citizen of St. Tammany parish, though from what he did know, a happening of that kind would seem to have been altogether possible. Thus, his cross-examination reads, in part, as follows:
“Q. Are you sure that you kept it (the vault) locked at 12 o’clock (when, as we infer, the office force went to dinner) every day since the ballot box has been deposited with you; I mean to your personal knowledge? A. No, not to my personal knowledge; I could not say that. Q. What, if anything, would prevent any person from going into the clerk’s office in this courthouse — your office? A. How do you mean? Q. In business hours, in the hours you keep open? A. None at all. Q. Any citizen can go in, can he? A. Sure. Q. Now, when he goes in your office, what keeps him from going into the vault? A. Nothing; it is open. Q. Well, you generally keep it open during your office hours? A. Yes, sir. Q. Do you know how many persons have been in your office, in the vault; since this box was deposited there? A. No, sir. Q. Do you know how long any person staying there? A. No, sir. Q. Do you know whether any person tampered with that box or not? A. No, sir. * * ^ Q. Was your vault open on Sunday (meaning the Sunday following the election)? A. It was open that Sundayyes, sir. Q. How long did it stay open, Mr.' Frederick? A. I could not tell you. * * * Q. Mr. Frederick, you would not undertake to say that no one has tampered with that box since it came into your vault, -would you? A. Well. I could not possibly; I don’t know. Q. Would you undertake to say, from your personal knowledge, that any one has had an opportunity to tamper with it? A. Well, I don’t know that either; I cannot say.”
The clerk had two deputies, Mr. G-illis and Mr. Blossman, and it was the custom of one or the other' of them to lock the vault when they went to dinner, and of him who was last in -the office to lock it at night; but sometimes it was only partially locked, at midday, and at times was left with no official in it, and at other times the vault was left entirely in the occupancy of third persons. In fact, the deputies, or one of them, sometimes used the vault as an office and remained there for hours, and other persons, not utter strangers or tramps, were allowed the same privilege. Mr. Gillis testifies that he was in the office on the Sunday following the election practically all day, and that the vault was open; that he went to the train, leaving it open; that he might have left the office for five minutes, but was unable to say whether the train had come in before he reached the station, or came in afterwards, or whether he left the station before or after its departure ; that, according to his recollection, he just walked over to the station to see who was coming, and did not pay any particular attention to the time that was thus occupied, save that he knew that it was only a few minutes. Upon the whole, it appears to us that the box was about as accessible to any one who may have had designs upon it as the *859 courthouse in which it was deposited. Defendant tendered the “three commissioners, the two clerks, seven watchers, two deputy sheriffs, and four other persons who kept the tallies (of whom three were supporters of the plaintiff), to prove that the votes were correctly read off from the ballots and as correctly marked down on the tally sheets and tallied as those who were engaged in that work were -able to perform it. But it was ruled that the testimony was inadmissible. He was, however, permitted to show that a qualified voter who offered to vote, and would have voted for him, was denied that right; and that a disqualified voter (who had not paid his poll tax for either 1914 or 1915) was allowed to vote, and voted for plaintiff.
Opinion.
[1, 2] If it were a fact that the returns were so confused or unintelligible as to render it impossible for the committee to declare the result, a resort to the ballots would have been the proper alternative, provided it had been affirmatively established that they were still in the box, in the condition in which they were deposited by the voters; but the burden rested upon the litigant offering the box containing the ballots to prove, not only that its contents had not been tampered with, but that there had been no opportunity for such tampering (Thornhill v. Wear, 131 La. 739, 60 South. 228), and that burden the plaintiff, 'by whom the ballots were offered, has fallen short of carrying. We are, however, of opinion that the returns of the commissioners were sufficiently intelligible to authorize a finding by the committee to the effect that defendant received 122, and plaintiff 74, votes, at the “Sandy Ford” precinct, and that such errors and omissions as have been called to our attention were insufficient to vitiate the election at that poll. Andrews v. Blackman, 131 La. 355, 59 South. 769.
[3] We are further of opinion that our-brother of the district court erred in excluding the testimony offered to show that 11 persons, residing, and who had resided for more than six months, in one precinct, were allowed to vote in another, on the ground that their votes had not been challenged at the poll. Const. art. 197, § 1; Marrero v. Middleton, 131 La. 372, 59 South. 791.
It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment herein dismissing this suit at the cost of plaintiff, and affirming the finding of the Democratic parish executive committee to the effect that defendant received a majority of the votes cast at the primary election of January 25, 1916, and thereby became the Democratic nominee to the office of assessor of the parish of St. Tammany.