(100 South. 444)

No. 26534.

## PEREZ v. COGNEVICH.

(April 28, 1924.)

*(Syllabus by Editorial Staff.)*

**1. Courts ⬀224(10)—Supreme Court has jurisdiction of primary election contest for nomination to office of parish assessor.**

Since, under Act No. 97 of 1922, § 27, test of appellate jurisdiction in contested primary election cases is to be determined by emoluments of office, Supreme Court has jurisdiction of contest for nomination to office of parish assessor, emoluments of which are alleged to be in excess of $2,000.

**2. Constitutional law ⬀56—When Legislature may add to jurisdiction of Supreme Court and decrease jurisdiction of courts of appeal stated.**

Legislature can neither add to jurisdiction of Supreme Court nor decrease jurisdiction of courts of appeal, where jurisdiction is fixed by Constitution, except when such instrument contains provision authorizing such legislation.

**3. Courts ⬀203—Statute prescribing test of jurisdiction held constitutional.**

Enactment of Act No. 97 of 1922, § 27, providing that emoluments of office for full term shall be test of appellate jurisdiction in primary election contests, was authorized under Const. 1921, art. 8, § 12, requiring the Legislature to provide for trial and determination of election contests.

**4. Elections ⬀154(10)—Evidence that voters had no right to vote inadmissible in rebuttal.**

In primary election contest evidence that certain persons were without right to vote was not proper rebuttal evidence.

**5. Elections ⬀154(9½)—Evidence that voters were disqualified inadmissible where right to vote not attacked in pleadings.**

Where, in primary election contest, a party has not attacked the right of certain persons to vote, in his pleadings, evidence that they are disqualified is inadmissible, in view of Act No. 97 of 1922, § 27.

**6. Elections ⬀113—Registration of voters not subject to collateral attack in primary election contest.**

Since Const. 1921, art. 8, § 5, and Act No. 122 of 1921, §§ 8, 9, 11, 12, and 13, provide direct proceedings to purge registration rolls, that voters at primary election had no right to vote because not legally registered or not entitled to registration, could not be raised by collateral attack on registration in primary election contest.

**7. Elections ⬀154(10)—Burden of showing that ballots have not been tampered with in election contest stated.**

Burden is on one seeking a recount, or who desires to offer ballots in evidence in an election contest to show that they have not been tampered with, and that they have not been placed in position to afford opportunity for tampering with them.

**8. Elections ⬀126(5)—Certificate of Secretary of State on ballots essential.**

By the direct provisions of Act 97 of 1922, § 16, certificate of Secretary of State on ballots is essential to their validity, and ballots not containing such certificate should not be counted, though omission is due to oversight in printing.

**9. Elections ⬀126(5)—Ballot cast with numbered slip attached invalid.**

Under the mandatory provision of Act 97 of 1922, § 16, casting of ballot with numbered slip attached is fatal to its validity.

**10. Elections ⬀126(5)—Pencil dot on ballot held not identification mark.**

Ballot with pencil dot slightly below and to left of one of squares *held* not invalid as marked for identification.

**11. Elections ⬀126(5)—Dots on ballots by defects in paper not identification marks.**

Dots on ballots caused by defects in paper *held* not marks of identification.

**12. Elections ⬀126(5)—Irregular cross-mark held not to invalidate ballot.**

Irregular cross-marks on primary election ballot *held* not to invalidate it, cross-mark not being required to be perfect.

**13. Elections ⬀126(5)—Erasures on primary election ballot held to invalidate it.**

Erasures on primary election ballot, which might serve as identification, *held* to invalidate ballot.

**14. Elections ⬀126(5)—Failure of precinct register to show party affiliations held not to invalidate ballots at primary election.**

That precinct register did not show party affiliations of voters at primary election *held* not to render their votes invalid, applications for registration showing that such voters had

registered as members of party holding primary, and poll lists showing that they were members of such party.

Leche, J., dissenting in part. St. Paul, J., dissenting in part, but concurring in the result.

Appeal from Twenty-Ninth Judicial District Court, Parish of Plaquemines; William H. Byrnes, Judge ad hoc.

Suit by Eldredge N. Perez against Marc Cognevich, to contest a primary election. Judgment for defendant, and plaintiff appeals. Affirmed.

James Wilkinson and John R. Perez, both of New Orleans, for appellant.

A. Giffen Levy, of New Orleans, for appellee.

By the WHOLE COURT.

OVERTON, J. At the recent Democratic primary election, plaintiff and defendant were opposing candidates for nomination for the office of assessor in the parish of Plaquemines. When the returns were promulgated, it appeared that plaintiff had received 619 votes and defendant 631. Defendant, having, therefore, received a majority of 12 votes over plaintiff, was declared the nominee by the parish Democratic executive committee. Plaintiff then brought this suit to contest the result of the election, basing his cause of action on various grounds. Defendant filed an answer, in which he puts at issue these grounds, and in which he avers, in addition, that certain votes were cast for plaintiff that are illegal, and should be deducted from the total vote declared by the parish Democratic executive committee to have been received by plaintiff. In his answer defendant also avers that two boxes, if not more, should be opened and recounted, and that, upon a recount of these boxes, and upon the rejection of the illegal ballots therein contained, the result will be to further increase his majority. His prayer is that plaintiff's demand be rejected.

The case was promptly tried, the trial lasting approximately two weeks. The trial court found that defendant had received a majority of three votes, and, therefore, rendered judgment in his favor, recognizing him as the Democratic nominee for the office of assessor in the parish of Plaquemines. Plaintiff has appealed from this judgment. Defendant has filed an answer to the appeal, in which he avers that certain votes not allowed him by the lower court should now be allowed, and that certain votes allowed his opponent by that court should be rejected. He has also filed a motion to dismiss the appeal on the ground that this court is without jurisdiction.

### Motion to Dismiss.

It is pleaded that we have no jurisdiction in this case, first, because it is not alleged that the nomination in controversy has any value; and even if it were alleged to have such value as to vest us with jurisdiction, still, in truth and in fact, there is nothing involved but a political right, not properly appreciable in money; and that, in cases involving such rights, the appeal lies, not to this court, but to the proper court of appeal.

It may be said, at the outset, that an appeal in a case in which a political right is in contest lies to the court of appeal of the circuit in which the case arose, save where it appears that this court has been granted jurisdiction. Sections 29, 35, and 77 of article 7 of the Constitution of 1921. But this observation merely leaves us where we started, and leaves for determination, in all of its fullness, the real question to be determined; that is to say, the one whether it appears that this court has been granted jurisdiction in cases such as the one now before us.

There is nothing in the present Constitution (that of 1921) which vests us with jurisdiction in contested primary election cases, unless it be the provision in section 10 of

article 7 of that instrument, which grants us jurisdiction in all cases in which the amount involved exceeds $2,000, exclusive of interest, or, in other words, in which the value of the thing in contest exceeds that amount. In the present case it is not alleged that the nomination in controversy is worth an amount exceeding $2,000, though it is alleged that the emoluments of the office of assessor in the parish of Plaquemines exceed $5,000. If the office itself were in contest, 'it could be easily held, under the constitutional provision just cited, in view of the emoluments of the office, that this court has jurisdiction, for then the value of the thing in contest would exceed the lower limit of our jurisdiction. In this case, however, it is only the nomination which is involved, and the nomination does not entitle the one receiving it to the emoluments of the office. Still, as the emoluments of the assessorship exceed $5,000, and as the nomination for that office is one by the dominant, and perhaps the only, political party in the parish of Plaquemines, and as it is unlikely, therefore, that the nominee will meet with defeat at the general election, it might be held that the nomination itself is worth over $2,000, and, hence, that the appeal lies to this court. We are, however, not strongly inclined to the view that the motion to dismiss for want of jurisdiction should be decided on that basis, but rather upon a different one, which is the following:

[1] Section 27 of Act 97 of 1922 provides:

"That in elections held under the provisions of this act [the primary election law] all contests shall be made before the courts of the state, as herein prescribed, which are hereby fully vested with the necessary power, authority, and jurisdiction to hear, try, and determine the same. * * * The party cast shall have the right to appeal as in other cases, on giving bond for a sum to be fixed by the court to cover cost of all courts, the emoluments of the offices involved for the full term being hereby made the test of the appellate jurisdiction. * * *"

It is clear from the foregoing legislative provision that the test of the appellate jurisdiction of this court, in contested primary election cases, is to be determined by the emoluments of the office for which the nomination is made. Therefore, when the office has no emoluments, or when the emoluments are $2,000 or less for the full term, then, by reading the provision cited, in connection with the sections of the Constitution defining the jurisdiction of the Courts of Appeal, which it was the manifest intention of the Legislature should be done, it at once becomes clear that an appeal lies and is returnable to the Court of Appeal of the circuit in which the case arose. On the other hand, when the emoluments of the office for which the nomination is made exceed $2,000 for the full term, then, by reading the provision quoted in connection with the section of the Constitution defining the jurisdiction of this court, it at once becomes clear that an appeal lies, and is returnable, to this court.

[2, 3] It is argued, however, that the Legislature can neither add to the jurisdiction of this court nor decrease the jurisdiction of the courts of appeal, since the jurisdiction of those courts is fixed by the Constitution, and defendant cites, in support of his position, State v. Mayer, 117 La. 945, 42 South. 435. Such unquestionably, is the rule where the jurisdiction of the courts affected is fixed by the Constitution, except when that instrument contains a provision authorizing the Legislature to enact such legislation. We think that in this particular instance the Constitution contains a clause authorizing the enactment of the provision quoted. The clause referred to is section 12 of article 8 of the Constitution of 1921, and reads as follows:

"The Legislature shall provide by law for the trial and determination of contested elections of all public officers, whether state, district, judicial, parochial, municipal, or ward (ex-

cept Governor and Lieutenant Governor), which trials shall be by the courts of law, and at the domicile of the party defendant."

The foregoing section has reference to primary elections as well as to elections by the people. It is a mandate to the Legislature to enact laws for the trial and determination of such cases in the courts of law. The section, it is true, contains no express authority authorizing the Legislature to say to what court the appeal should be taken, in the event the party cast should desire to appeal, but we think that this authority is fairly implied in the command given, and that the exercise of it is necessary in order to fully and properly execute that command. If there should be anything in the Constitution, of a general nature, which apparently stands in the way of the full and proper execution of this special mandate, such provision must be considered as yielding, for the purpose of permitting the full execution of the mandate. Taxpayers' Association v. New Orleans, 33 La. Ann. 568; Davidson v. Houston, 35 La. Ann. 493.

For the foregoing reasons, we are not of the opinion that the motion to dismiss should be sustained.

## The Merits.

[4, 5] After both plaintiff and defendant had closed in chief, the former offered evidence to show that a number of persons who cast their ballots for defendant had no right to participate in the election. The effect of this evidence was to inject into the case the right of persons to vote, whose right to do so had not been questioned in the pleadings, nor by any evidence offered up to that time. Defendant objected to this evidence chiefly upon the ground that it was not evidence in rebuttal, but the court overruled the objections. The objections should have been sustained. Plaintiff, in order to show that these persons were without right to vote in the election, if such were the case,

should have alleged, in his petition, their names and the reasons why they were without right to vote therein. Section 27 of Act 97 of 1922; Thornhill v. Wear, 131 La. 479, 59 South. 909. He then should have offered this evidence in chief, and not in rebuttal. The evidence was not, in any proper sense, rebuttal evidence.

The votes of some of those thus brought into question were later allowed by the lower court for the reason that the court was of the opinion that the evidence thus introduced did not show that those who cast these ballots were without right to vote in the primary. However, while defendant was not injured in some respects by the ruling made, yet, in other respects, he was, for upon the whole he lost 7 votes by the overruling of the objection, which he would not have lost had the objection been sustained. The votes thus lost by him are those referred to in the briefs as the three Dobsons, the two Gleasons, Grob, and E. A. Schayot. The trial court erred in deducting these votes from defendant's total. They should be allowed. On the other hand, plaintiff objected during the course of the trial, to evidence offered by defendant to show that Mr. and Mrs. Serpas and Will Alfonso, who cast their votes for plaintiff, had no right to vote in the election. The objection was based upon the ground that defendant had not attacked in his answer the right of these persons to vote, and hence that the evidence offered was inadmissible. The objection is well founded, and should have been sustained. As a result of the ruling, plaintiff lost the three votes mentioned. The trial court erred in deducting them from the total vote received by plaintiff. They should be counted.

## Collateral Attack on Registration.

Defendant attacked the votes of 8 persons who voted at the Ostrica poll, Third precinct, Fourth ward, on the ground that these voters resided outside of that precinct, and

therefore had no right to vote in it. Defendant also attacked the vote of Anthony Jurgovich, who, he contended, lived at Olga, but who voted at Boothville, in another ward, on the ground that Jurgovich had no right to vote at the latter place. On the other hand, plaintiff attacked the vote of Emile Martin, Sr., the registrar of voters, on the ground that in registering he administered the oath required by law to himself, and hence that his registration was null.

The eight voters who voted at Olga did not change their residence after they registered, nor did Jurgovich change his. Each voted at the polling place indicated in his registration papers.

If these persons had no right to vote because they were not entitled to a place upon the registration rolls, or because they were not entitled to registration as voters in the precinct in which they registered as such, or because their registration did not comply with the law in other respects, the proper proceeding should have been taken to purge their names from the rolls. Both the Constitution and the enactments of the Legislature contemplate direct proceedings against a voter to strike his name from the rolls, except, of course, when it appears that the voter has died, or it appears that since his registration he has been convicted of a felony, or has been declared insane. Section 5, art. 8, Constitution of 1921; sections 8, 9, 11, 12, and 13 of Act 122 of 1921.

[6] Were we to give our sanction to the attack here made, we could do so only by ignoring the methods provided by law for purging the rolls, and by permitting what is equivalent to a collateral attack upon the registration of the voters in question, which, of course, we cannot do. See Turregano v. Whittington, 132 La. 454, 61 South. 525, and Smith v. Police Jury, 125 La. 731, 51 South. 703.

For the foregoing reasons we conclude that the trial judge was correct in refusing to sustain the attack here considered upon the right of these persons to vote.

## Opening of Ballot Boxes and Recount.

Plaintiff, in his petition, demanded a recount of the ballots in certain boxes. Defendant objected to the recount on the ground that it did not appear that the clerk of court had safeguarded the ballots to an extent sufficient to exclude the hypothesis that they had been tampered with. The objection was overruled.

[7] The law places the burden upon him who seeks the recount, or who desires to offer the ballots in evidence, to show that they have not been tampered with, and that they have not been placed in a position to afford an opportunity for tampering with them. Thornhill v. Wear, 131 La. 739, 60 South. 228; Koepp v. Crawford, 138 La. 852, 70 South. 858. Plaintiff, we think, has reasonably carried that burden. We may say, however, that the opening of the ballot boxes did not operate to plaintiff's benefit, due to defective ballots found in them, though it may be also said that plaintiff did not lose his case by having the boxes opened.

## Ballots Without the Certificate of the Secretary of State.

It was found, on opening the box from Doullut's canal, that it contained four ballots, without the certificate of the Secretary of State printed on them; and when the box from Home place was opened it was found that it contained one ballot without that certificate. These ballots were for plaintiff. Defendant objected to the counting of these votes for the reason that there was not printed on them the certificate mentioned. The contention of plaintiff is that the failure to print the certificate of the Secretary of State on these ballots was due to an accident, or to an oversight of the official printer, in printing them. The absence of the certificate from them, it may be said, was,

in all likelihood, due to such a cause. The question, however, is: Should these votes, in view of this oversight, be rejected? The answer to this question depends upon the provisions of the primary election law. Section 16 of that law (which is Act 97 of 1922) provides:

"That the primary election ballots used in all primary elections for United States senators, congressmen, governor, and other officers voted for throughout the entire state, or voted for in any district, parish, or ward in this state, * * * shall be furnished by [the] Secretary of State, at the expense of the state. * * * All said ballots shall be printed upon white paper, of uniform quality, texture, and size, and printed in black ink, and each ballot at the bottom, and after the pledge, shall contain a perforated slip with its number displayed in large numerals, which said slips shall be numbered from 1 to 1,000, as may be required. At the top of said ballot, printed in large capital letters, shall be the party designation; then shall follow the number of the primary district and location of [the] polling place. Then shall follow the name of each office, and below the name of each office, in smaller capital letters, shall follow the names of all candidates (alphabetically arranged, according to surname) for the nomination of said office, in the order in which said list of officers shall be arranged by the respective party committees. The names of all candidates shall be printed in type of uniform size and style, and in vertical column. Immediately following and opposite the name of each candidate, on the same line, shall be printed a square space, and all such square spaces shall be of uniform size. Spaces between the names of candidates for each office shall be uniform, and sufficient space shall separate the names of candidates for one office from the names of candidates for another office, to avoid confusion. * * *

"The ballot as above set forth * * * shall be prepared by the Secretary of State, *who shall certify to it as the official ballot, on the back of the ballot, over his stamped signature,* and who shall furnish the ballot pressed and folded in uniform fold, and creased so as to display on the reverse or back of the ballot, when folded, the printed or script certificate of the Secretary of State. [Italics ours].

"* * * No primary election ballot shall be used unless the same shall substantially comply with the requirements of this act, *and any ballots not in accordance herewith shall be void*

*for all purposes, and shall not be received, deposited, or counted* by any commissioner or commissioners of such primary election. * * * [Italics ours]."

If it cannot be held that ballots sent out by the Secretary of State, from which the certificate in question is absent, are nevertheless in substantial accordance with the requirements of the act, then it is clear, under the provisions of the act, that such ballots cannot be counted. The purpose of the certificate is to identify the ballots as being official, and thereby make it more difficult to substitute other ballots for the official ones, and in that manner safeguard better the purity of the election.

[8] In our opinion the certificate of the Secretary of State, on ballots sent out by him, is essential to their validity, and as the ballots in question did not contain this certificate, they, therefore, should not be counted. The fact that the absence of the certificate was, in all likelihood, due to an accident or to an oversight in printing the ballots, and may be accepted as such, does not justify the counting of them, in the face of the provision in the statute prohibiting the counting of ballots which do not substantially comply with the requirements of the statute. However, the absence of the certificate on ballots sent out by the Secretary of State, and cast in an election, might, and probably would, call for the annulling of the election, and the holding of another one, in the event the rejection of such ballots should change the result, for, while the requirements of the law must be maintained, yet the electors are entitled to ballots complying with those requirements. See Hart v. Picou, 147 La. 1017, 86 South. 479. However, in this case, whether the five ballots under consideration be counted or not does not change the result. Still, they should not have been counted, and ought to be deducted from plaintiff's vote.

## Ballots Voted With Numbers Attached.

[9] When the box from Daisy poll was opened during the trial of the case it was found that there were eight ballots in it that were cast for defendant, each of which still had attached to it the slip containing its number. The law requires that the voter, after preparing his ballot, and before casting it, shall permit one of the commissioners of election to detach the slip. Section 16 of Act 97 of 1922. This provision is mandatory, and the casting of the ballot, with the numbered slip attached, is fatal to the validity of the vote. The trial court correctly refused to count these votes.

## Marked Ballots.

[10, 11] When the box from Belair was opened, there was found in it a ballot with a pencil dot on it, the dot being slightly below and to the left of one of the squares on the ballot. This ballot was cast for plaintiff. Defendant objected to its being counted on the ground that it was a ballot marked for identification. The trial judge deducted the ballot from the total vote received by plaintiff. In our opinion, he should not have done so. The dot, apparently, was put on the ballot accidentally, and is so small as to be scarcely noticeable. This ballot should be counted for plaintiff. There was found in the Boothville box a ballot, voted for defendant, with two dots on it, appearing immediately under the names of two candidates, and another ballot was found in it, for defendant, with three dots on it. In the Doullut box there was found a ballot, for defendant, with a small dot on it, and also another in that box for him, with two dots on it. The dots on these ballots are caused by defects in the paper on which the ballots are printed, and, therefore, are obviously not marks of identification. The trial judge was correct in counting these votes. In the Doullut box there was found a ballot for de- fendant said to have on it a visible erasure. We, however, fail to see any erasure on the ballot. The mark, said to be one, is, in our view, nothing more than a soiled spot, scarcely perceptible, caused possibly by a finger print made in handling the ballot. The trial judge counted this ballot for defendant. There was found in the Boothville box a ballot for defendant with four or five pencil dots on it. These dots are scarcely perceptible, and would hardly serve as marks of identification. The trial judge was correct in counting this ballot for defendant. In the Pointe a la Hache box there was found a *ballot for defendant with irregular cross marks in the voting squares opposite the names of the candidates for whom the voter cast his ballot, with the exception of the voting space opposite the names of two of these candidates. When the ballot is turned sideways, these irregular cross marks resemble inverted fours.

[12] The law requires the voter to indicate for which of the candidates he desires to cast his ballot by making a cross mark in the square opposite the names of such candidates, but it does not require that the cross mark be a perfect one. See Vidrine v. Eldred, 153 La. 779, 96 South. 566. We are of the opinion that the lower court was correct in counting this vote for defendant.

[13] In the boxes opened during the course of the trial several ballots were found, for plaintiff, with erasures on them. These erasures are quickly seen, and are such as might reasonably serve the purpose of marks of identification. The trial court was correct in not counting these votes. Vidrine v. Eldred, supra.

## Party Affiliation.

Plaintiff attacked the votes of Henry Gebhauer, Enid Gonzales, Emile Martin, Sr., and John Friedman on the ground that the precinct register failed to show their party affiliation at the time they voted. The ap-

plications of these voters for registration show that they registered as members of the party holding the primary. The poll lists sent to the respective precincts at which these persons voted show that they were members of that party.

[14] The fact that the precinct register did not show their party affiliation, did not, in our opinion, defeat their right to vote, or render their votes invalid, and the trial judge properly so ruled.

We find no error in the ruling of the trial court with respect to the vote of Joseph Bernard, or with respect to the ruling as to Mr. and Mrs. Frank Hingle.

Our conclusion is that defendant received a majority of 11 votes in the primary; and hence that the lower court properly rejected plaintiff's demand.

The law requires us to decide contested election cases within 24 hours after they are submitted. In this case it was impossible for us to decide the case within that time, and give reasons for judgment. Hence, the moment the case was decided in consultation (which was immediately before the expiration of the 24 hours allowed) the decree was handed down, with the right reserved to give written reasons later. For the purpose of convenience, we repeat here the decree rendered, which is as follows:

"The plea to the jurisdiction of the court is overruled and the judgment of the lower court is affirmed with costs."

O'NIELL, C. J., concurs in the result, but is of the opinion that, on the question of jurisdiction, it would suffice to say that the nomination in this case is worth more than $2,000.

LECHE, J. I do not believe that this case is within the jurisdiction of the Supreme Court, but I concur on the merits.

ST. PAUL, J. (concurring). I concur in the decree, and also in the opinion, as far as

it goes; but there are some things into which the opinion does not go, and into which I think it well to enter.

## I.

When the case was first under consideration I entertained serious doubts as to the jurisdiction of this court. It is true that the primary law, Act 97 of 1922, section 27, pp. 196, 197, declares that—

"In elections held under the provisions of this act all contests shall be made before the courts of the state, as herein prescribed, which are hereby fully vested with the necessary power, authority, and jurisdiction to hear, try, and determine the same. * * * The party cast [in the court of original jurisdiction] shall have the right to appeal as in other cases, * * * the emoluments of the offices involved for the full term being hereby made the test of the appellate jurisdiction. * * *"

But, *ordinarily*, the Legislature cannot either give or withdraw jurisdiction from this court, the jurisdiction thereof being *fixed* by the Constitution itself. That jurisdiction does not extend to mere civil or political rights. See Ryanes v. Gleason, 112 La. 612, 36 South. 608; Conerly v. Democratic Committee, 130 La. 457, 58 South. 148; State v. Lobrano, 146 La. 509, 83 South. 786, and others therein cited.

Now the emoluments of the office herein involved amount, for the full term, to more than $2,000, so that if *title to the office itself* were involved there is no doubt that this court would have jurisdiction. Const. 1921, art. 7, § 10, par. 3, p. 39.

But the amount (matter) in dispute, in this case is not the title to the office, but the right to a *party nomination* for that office; and whilst the jurisdiction of this court *might* be maintained on the ground that the title to the office itself is involved, I have concluded that the jurisdiction really comes from another source, to wit, the express grant of authority to the Legislature in ar-

ticle 8 of the Constitution of 1921, p. 74, to wit:

"Section 12. The Legislature shall provide by law for the trial and determination of contested elections of [for] all public officers, whether state, district, judicial, parochial, municipal, or ward (except Governor and Lieutenant Governor), which trial shall be by the courts of law, and at the domicile of the party defendant."

And the opening words of section 15 (page 75), to wit, "All elections by the people, except *primary elections and municipal elections in towns having a population of less than 2,500*, etc.," show that, within the meaning of the Constitution, the word "election" includes *primary elections*, unless specially excepted.

So that we find in section 12, aforesaid, not only *express* authority to provide for "contested elections," but a *mandatory* direction to do so. That is to say, the Legislature is *commanded* to provide for the trial of *contested primary elections*, which contests shall be *before the courts*.

I take it, then, that since the Legislature is commanded by the Constitution to provide for the trial of contested election cases *before the courts*, it is vested by that instrument itself with *all the power necessary* to carry that command into effect; and if, here and there in the Constitution, provisions be found which, in their general application, would conflict with the power necessary to regulate such contests effectively, then such conflicts must yield to the power thus specially granted.

In Taxpayers' Association v. New Orleans, 33 La. Ann. 568, plaintiffs attacked, as unconstitutional, Act 74 of 1880, relative to liquidating the indebtedness of said city, on the ground that said act was local and special, and had not been *advertised* as required by article 48 of the Constitution of 1879. The court held that even conceding the act to be local and special, yet it was passed by express command of the Constitution, article 254, and hence the prohibition in article 48 against passing local and special laws without previous notice, was not applicable.

In Davidson v. Houston, 35 La. Ann. 493, plaintiff attacked the constitutionality of Act 38 of 1880, providing for the publication of tax advertisement in the French language, in New Orleans, on the same ground that Act 74 of 1880 had been attacked, as aforesaid. The court held that the statute was passed under authority *expressly granted* in article 154 of the Constitution, and hence, again, the prohibition in art. 48 did not apply.

From these I conclude that when the Constitution expressly grants certain powers to the Legislature, and particularly when the Constitution lays certain definite *commands* upon the Legislature, any provisions of the Constitution which conflict with such grant, or which hinder or nullify such power must yield to the necessities of the situation.

Now, if appellate jurisdiction be made to depend solely on the amount involved, and if a *party nomination* can be said not to involve the emoluments of the office (and, it might be said in some cases), then the necessary consequence thereof would be that all contested election cases would go to the Courts of Appeal. If that were all, it would signify nothing, for I am satisfied that the able judges who preside in those courts are quite competent to decide them correctly. But that is *not* all. If the provisions of the Constitution are to be the sole guide in such appeals, then we have section 11 of article 7, p. 41, according to which the judgments of the Courts of Appeal do not become executory until 30 days after an application for rehearing has been denied, and until this court has acted upon an application for a writ of review if made within said 30 days; which delays do not begin to run until notice be given in accordance with the rules adopted by said Court of Appeal. Const. art. 7, § 24, p. 45; also Salittes v. Southern

Pub. Co., 140 La. 739, 743, 73 South. 847, and *especially* Vidrine v. Dupre, 136 La. 820, 823, 67 South. 893.

But all the cumbersome procedure (which the defendant, if cast, would certainly insist upon, since, if no final judgment be rendered in time, he would continue the nominee [Primary Law, § 31, p. 201]) would certainly result in no contested election case ever being finally disposed of in time for printing and distributing the ballots for the general election. And hence the whole plan for a contested primary would prove abortive.

Hence it was that the Legislature provided for no rehearings, and failed *ex industria* to provide for a writ of review to this court in contested election cases appealed to the Courts of Appeal; thus leaving the judgments of said courts in such matters *final from date of rendition.*

All of which it had the right to do under section 12, page 74, quoted above.

I am, therefore, of opinion that the Legislature had absolute authority to fix the jurisdiction on appeal in contested election cases as it thought proper; and I concur in the judgment overruling the exception to our jurisdiction herein filed.

It was upon these grounds that on April 2, 1924, we refused a writ of review to the Court of Appeal for the parish of Orleans, in the matter entitled James Barrett v. Thomas J. Dobbins, 155 La. 1017, 99 South. 855, No. 26,552 of our docket, where we said:

"The writ herein prayed for is refused for the reason that a writ of review does not lie from this court to the Court of Appeal in contested primary election cases, and the judgment of that court in such cases is final and executory from rendition."

## II.

I concur fully in so much of the opinion as in effect refused to entertain an action to *strike from the registration rolls* the names of voters in a manner different from that provided by the Registration Law, Act 122 of 1921, § 9, p. 303; or by article 8, 5, par. 2, p. 73, of the Constitution of 1921 (excepting those specially denied the right to *vote even though registered,* by section 6, p. 73, and paragraph "a" of section 1, p. 69, of the same article, to wit, criminals, idiots, etc., and those who have removed *since registering*).

## III.

I dissent from so much of the opinion as in effect permits voters to testify how they *would have voted,* if allowed to do so. Persons offering to vote, and claimed to be disqualified, should, none the less, have been allowed to vote under *protest* in the manner hereinafter stated (and their votes counted or not counted as the commissioners might decide).

Where this was not done, and sufficient number of them to *have changed the result of the election* were denied the right to vote by the election officers (without fault of their own), the election *should be annulled,* regardless of how they might have voted. Payne v. Gentry, 149 La. 707, 711, 90 South. 104; Bartmess v. Hendricks, 150 La. 627, 629, 91 South. 68; Hart v. Picou, 147 La. 1017, 86 South. 479; Vidrine v. Eldred, 153 La. 779, 96 South. 566.

Where they were not sufficient in number (offering to vote) to have changed the result, the election must stand, and the electors (if qualified) relegated to their action for damages. Bridge v. Oakley, 12 Rob. 638 (Judge Martin's last opinion).

But this court cannot hold a new (and perhaps different) election at this time and place. Whatley v. LaSalle Parish School Board, 155 La. 797, 99 South. 603 (our No. 26,359).

## IV.

I further dissent from so much of the opinion as in effect allows voters to attempt, in effect, to identify their ballots by swearing that they voted this way or that. The primary election law allows every candidate a *watcher* at the polls, and allows every watcher to *challenge* any voter for any cause, Act 97 of 1922, § 25, pp. 191, 192; but it also requires that every protested ballot shall have attached to it a memorandum setting forth the *name of the voter and the ground of protest*. Section 20, p. 188.

This provision was put there for a purpose, and that purpose was to identify the ballots and prevent the defeat of an election held according to law, by an *ex post facto* election, the result of which would depend not on the manner in which the electors *voted* but on that in which they might *swear* they voted (without fear of contradiction).

At any rate the statute provides a method of proving the contents of protested ballots; and, in my opinion, that method is exclusive of all others. For it is essentially a matter of public policy what proof shall be admitted to overturn the publicly declared result of an election held by the duly constituted authorities. The electorate *in general*, the people, have a more vital interest in such result than even the candidate himself, and infinitely more than the individual voter by whose oath (incapable of refutation) said results might be upset. To admit any departure from the method of proof provided by the statute is simply to open the door to all manner of fraud and corruption, and to bring scandal into our elections.

## V.

I think the Daisy box should *not* have been opened for a recount; it is *not shown conclusively that* THAT box was not tampered with.

I, therefore, concur in the result.