**195 So. 504**

**BELL v. GUENARD et al.**
**No. 35753.**

March 13, 1940.
Opinion April 1, 1940.

James H. Gilfoil, Jr., of Lake Providence, for appellant William Y. Bell.

Henry G. Norris, of Lake Providence, and Geo. Wesley Smith, of Monroe, for appellee.

ODOM, Justice.

Plaintiff and defendant were opposing candidates for the office of Clerk of Court of East Carroll Parish at the Second Primary Election held on February 20, 1940. Based on the returns made to it by the commissioners and clerks of election, the Parish Democratic Executive Committee declared that defendant was the nominee.

Plaintiff brought this suit contesting the election. At the end of the trial in the district court, there was judgment decreeing that plaintiff and defendant had received the same number of votes, and that neither was nominated. The court ordered that the Executive Committee convene at the courthouse on a day designated for the purpose of correcting the returns and promulgating the same as altered·and corrected by the court. Both parties appealed.

Section 27, Act 97 of 1922, the primary election law, requires this court to decide

cases of this kind within twenty-four hours after submission. We have found it physically impossible to write an opinion in support of our conclusions within that limited time. We have decided the case, however, within that time, and for oral reasons assigned hand down the following decree, written reasons therefor to be filed later:

For the reasons assigned, the judgment appealed from, decreeing that neither plaintiff nor defendant was nominated for the office of Clerk of Court of East Carroll Parish at the Second Primary Election held on February 20, 1940, each having received the same number of votes, and commanding the Democratic Executive Committee for the Parish of East Carroll to convene at the courthouse immediately for the purpose of correcting the returns and promulgating the same as altered and corrected in compliance with the decree of the court, and to take such other official action as may be necessary in the premises and in compliance with the law, be, and the same is hereby, affirmed.

### Opinion.

The Democratic Executive Committee for the Parish of East Carroll, after canvassing the returns of the Second Primary Election made to it by the commissioners and clerks, selected to hold the election, promulgated the results as shown by the returns, and in a formal resolution declared that the defendant Guenard had been nominated by majority of one vote, and issued to him a certificate of nomination.

The plaintiff Bell brought the present suit contesting the election. He alleged that he received a majority of all the votes cast at said election and was therefore the nominee. His first ground of complaint is that at Precinct 1 of Ward 2 the commissioners of election erroneously rejected and marked as spoiled six ballots which were cast for him. But he failed to set out in detail sufficient facts to show that the action of the commissioners in rejecting the ballots as spoiled was wrongful and illegal. His allegations that these six ballots were erroneously rejected as spoiled are mere conclusions, and his counsel conceded that the petition sets out no cause of action in so far as this point is concerned, under the ruling of this court in Lafargue v. Galloway, 184 La. 707, 167 So. 197; State ex rel. Todd v. Mills, 191 La. 1, 184 So. 350; and Landry v. Ozenne, La.Sup., 195 So. 14, decided March 12, 1940.

His second ground of complaint is that at Precinct 2 of Ward 5 he received 17 votes but was credited with only 16 votes at that box. This claim is based upon the allegation that the votes, as tabulated and marked as they were called out, showed 17 but that the commissioners had erroneously extended the total vote as 16, and that the Executive Committee in canvassing and promulgating the returns had given him credit for only 16 votes.

His third point is that at Precinct 1 of Ward 5 "one ballot which was in all respects properly voted for your petitioner * * * was either marked or declared spoiled by the Commissioners of Election at such precinct and not counted for your petitioner for the sole and only reason that the said ballot had a mark in the square or box opposite the name of each of the two candidates

running for nomination as Representative of the Parish of East Carroll in the Louisiana Legislature at said primary election on February 20, 1940, and only one should have been voted for. That such action on the part of the Commissioners was erroneous and illegal and if not corrected deprives your petitioner of one vote which should have been, and which should be, counted for him as having been properly cast".

Plaintiff alleged that an examination of the ballots contained in the boxes would show that he had received 17 votes at Precinct 2 of Ward 5, and that an inspection of the ballot cast for him at Precinct 1 of Ward 5, which the commissioners had rejected as spoiled, would disclose that it was in fact a legal ballot and should have been counted for him.

Plaintiff alleged that the ballot boxes used at the precincts above named were then in the custody of the clerk of court; that said boxes and the ballots therein had been properly and carefully safeguarded, had not been tampered with by outsiders, were in the same condition as they were when they left the hands of the commissioners and clerks by whom the boxes had been carefully locked and sealed, and that said boxes should be brought into court, opened, and that the ballots therein be recounted and inspected.

Plaintiff did not allege that the clerks and commissioners or the Executive Committee had been guilty of any fraud, but charged that the errors and irregularities complained of amounted to legal fraud, which, if not corrected, would deprive him of his nomination to which he was justly entitled.

He prayed that the clerk of court be ordered to produce in open court the three ballot boxes in question, and that, after they were produced, the court order the same opened, and that the ballots therein be recounted, that the tabulations be recompiled, and that after said recount and recompilation the plaintiff be adjudged the nominee for said office.

Defendant excepted to plaintiff's petition on the ground that it set out no cause of action. Reserving his rights under the exception, he filed answer, denying that there were errors and mistakes made by either the commissioners of election or by the Executive Committee. He specifically alleged that he had received a majority of all the votes cast at the election and was properly declared to be the nominee by the Executive Committee.

Defendant alleged in his answer that, at Precinct 1 of Ward 7, 22 ballots which had been cast for parish officers had been deposited by the voters in the ballot box provided for the reception of ballots for state officers; that these ballots, when found in the state box by the commissioners, were counted by the commissioners for the parochial candidates just as if they had been found in the parish box; that these ballots, having been deposited in the wrong box, should not have been counted by the commissioners for any one, for the reason that they had been illegally cast under the primary election law, and that 13 of these votes, which were counted for plaintiff, should be deducted from his total of 909 votes, as found by the Committee, reducing his total number of votes to 896, and that

9 of the votes, which were counted for defendant, should be deducted from his total of 910, as found by the Committee, reducing his total number of votes to 901, thereby giving defendant a clear majority of 5 votes instead of a majority of one vote, as found by the Committee.

At the trial of the case counsel for defendant objected to the opening of the ballot boxes and the recount and inspection of the ballots therein on the ground that the ballots had not been properly safeguarded. This objection seems to have been insisted upon only in so far as it related to the box containing the ballots cast in Precinct 1 of Ward 5, because no testimony was introduced by either side relating to the handling and safeguarding of the ballots cast at any other precinct. This was the ballot box containing the ballot which plaintiff alleged had been erroneously rejected as spoiled by the commissioners but which he alleged was a legal ballot. The box containing the ballots cast at Precinct 2 of Ward 5 was opened in court and the ballots recounted. But, so far as the record discloses, no testimony was adduced showing the method of handling and safeguarding the ballots therein.

A recount of the ballots in this box showed that plaintiff had received 17 votes instead of 16, as counted by the commissioners and as proclaimed by the Committee. Clearly, therefore, plaintiff was entitled to one vote more than he was given credit for at that precinct. Crediting him with this additional vote would make his total 910 votes instead of 909, as found by the Executive Committee. This would result in a tie vote between the candidates if there are no other irregularities.

The remaining points to be decided are, first, whether the court erred in permitting the ballot box containing the ballots cast at Precinct 1 of Ward 5 to be opened and the ballots offered in evidence; second, whether the ballot therein which plaintiff alleged had been erroneously marked as spoiled and rejected by the commissioners was in fact a spoiled ballot, and third, whether the 22 ballots cast for parish officers at Precinct 1 of Ward 7, but deposited in the state box by the voters, should have been counted along with other ballots cast for parish officers.

Disposing of these points in the order named, we find that the ballot box for Precinct 1 of Ward 5, which contained the ballots and all other election supplies, was placed in the hands of a sworn deputy to be delivered to the commissioners at that precinct; that he delivered the box as ordered and that he remained at the precinct during the entire day of election; that the commissioners, after counting and tabulating the votes, placed them in the box together with their returns, locked and sealed the box, and delivered it to the deputy, who immediately carried it to the courthouse in Lake Providence, about nine miles away, intending to deliver it to the clerk of court, as ordered, but that, when he reached the courthouse, the clerk of court was not present and that he delivered the box to the clerk of the police jury, whose office was adjacent to the clerk's office.

He testified that, when he delivered the box to the clerk of the police jury, it was locked and sealed and in the same condition in which it was when he received it from the commissioners. The clerk of the police jury testified that the box was deposited on the floor of his office; that there were a number of people present there at that time but that the box was not touched by him and was not handled by any of those in the office while he was present. He said, however, that he was absent from his office for about 10 minutes during the thirty-minute period in which the box remained in his office. The testimony shows that the clerk of court reached her office about 30 minutes after the box was delivered by the deputy to the clerk of the police jury, and that upon her arrival the box was carried to her office and by her deposited in what is referred to as a record vault, where it remained until it was produced by her in open court.

The testimony shows that this record vault where the ballot box remained is open to the public for the inspection of the public records kept therein, and that a number of outsiders went into the vault during the several days while the box remained there; that two ladies doing WPA work were in the record vault for six hours during each working day. Both of these ladies were called as witnesses and testified that they saw the ballot box on the floor of the record vault; that it was not touched by either of them or by anyone else, so far as they knew, and testified further that, if it had been handled by anyone else, they would have observed it.

The clerk of court testified that, when she received the ballot box and deposited it in the record room, or vault, it was locked and sealed, and that when she produced it in open court it was in precisely the same condition as it was when she received it. The testimony shows that the key with which the commissioners locked the box was deposited by them in the box, presumably through the slot in the top of the box through which the ballots were deposited. The box was sealed by the commissioners in this manner: The slot in the top through which the ballots were deposited was covered with a piece of paper or cardboard, which was fastened securely to the box with sealing wax. They wrapped a piece of tape around the box so as to fasten the top of the box to the bottom of it, and this tape also was securely fastened to the box by sealing wax. According to the testimony, the box itself could not be opened without cutting or breaking the tape, and nothing could be put into, or extracted from, the box without breaking the seal over the slot.

The clerk of court testified that, while she worked at her desk in her office, her face was toward the door between her office and the record room, or vault. She testified that, so far as she had observed, no one had touched or handled any of the boxes which had been placed in her custody.

The trial judge in his written opinion stated that, when the box was brought into the courtroom, he personally inspected it carefully, and that his inspection satisfied him that the box had not been tampered

with and that neither the tape around the box nor the seal over the slot was broken.

 Under these circumstances the trial judge did not err in permitting the box to be opened and the ballots therein inspected. Counsel for defendant, who objected to the opening of the box, rely mainly on the case of McConnell v. Salmon, 174 La. 606, 141 So. 73, 76, where this court held that, because the ballot boxes had been exposed to outsiders and not safeguarded as the law requires, the ruling of the court permitting the ballots therein to be inspected and recounted was erroneous. That case is distinguishable from the one at bar. The court in that case said: "The boxes or some of them were not sealed by the commissioners, and, while all of them were locked, the keys were left on them, which amounted to the same as not locking them at all or leaving them open. While in that condition, they were in the hands of unauthorized persons who were under no legal obligation to protect them."

In that case the court said that the testimony showed that the keys were fastened to the locks by strings and were hanging on the outside of the boxes, so that the ballots in the boxes were easily accessible to those who might for any reason desire to tamper with them.

Counsel also cite the case of Welch v. Fitzgerald, 144 So. 73, 76, decided by the Court of Appeal, First Circuit. In that case the court held that the ballots could not be offered in evidence because the testimony showed that they had not been properly safeguarded. The court cited and followed the ruling of this court in the case of McConnell v. Salmon, supra. In the course of its opinion, the Court of Appeal said: "There is no direct evidence in this case to show whether the box in question was sealed or not. It does appear, however, from the testimony of the clerk of court, that it was in the same condition when produced in court as it was when it had been delivered to him, and, in arguments and brief of counsel for defendant, not disputed by counsel for plaintiff, it is stated that the box was not sealed as it appeared when produced in court, and that the key was attached to it."

That is the same condition which this court found in the McConnell v. Salmon case. When a ballot box is not sealed and when the key to the lock is hanging on the outside, the ballots in the box may be as easily tampered with as if the box had been left open. When a box in that condition is left so exposed to outsiders as to afford an opportunity for it to be tampered with, the ballots "lose their presumptive purity" and are not admissible in evidence. The testimony adduced in this case convinces us that the box was never at any time left so exposed as to afford interested persons an opportunity to tamper with the ballots without the attempt's being detected.

But, aside from this, it is definitely shown that the ballots themselves could not have been tampered with because the box was locked and sealed by the commissioners and remained so locked and sealed until it was brought into court.

 The next question is whether the ballot under controversy is a spoiled bal-

lot. We think it is. The ballot itself was brought up in the record. There are two names printed thereon as candidates for representative. On its face, the ballot shows that a cross mark was made in the voting space opposite the name of one of the candidates and then erased. This cross mark was heavily indented on the paper with a lead pencil, and, while the lead coloring made by the pencil is almost completely erased, the indentation made on the paper clearly remains. There is a cross mark not erased opposite the name of the other candidate for representative, and a cross mark opposite the name of the plaintiff in this case.

Counsel for plaintiff argues that it is evident that the voter made a mistake by placing the cross mark opposite the name of one candidate and that he made an honest effort to correct his mistake by erasing that cross mark. That may be true, but the commissioners who rejected the ballot as spoiled had no way of knowing that, nor have we. The fact is that the erasure is clearly seen and is such as might reasonably serve the purpose of a mark of identification.

In Vidrine v. Eldred, 153 La. 779, 96 So. 566, 568, it was contended that several ballots were spoiled. The ballots were brought up in the record and inspected by the court. The court found that some of the ballots had been signed by the voters, some of them contained marks other than the cross marks in the squares opposite the names of candidates, others had on them additional cross marks or checks or lines outside the square, and the court said:

"Some contained visible erasures. All these votes we reject as containing marks capable of serving as identification marks, though perhaps not so intended by the voter. These are marked ballots and should have been rejected."

In Perez v. Cognevich, 156 La. 331, 100 So. 444, 449, the same situation was presented, and the court said: "In the boxes opened during the course of the trial several ballots were found, for plaintiff, with erasures on them. These erasures are clearly seen, and are such as might reasonably serve the purpose of marks of identification. The trial court was correct in not counting these votes." (Citing Vidrine v. Eldred, supra.)

In the case of Turregano v. Whittington, 132 La. 454, 61 So. 525, in which certain ballots were rejected as being spoiled, it is stated in the syllabus written by the court that under the primary election law, which at that time was Act 198 of 1912, ballots are invalidated for certain specific reasons therein stated, among them being "by using marks or making erasures of such a nature as to distinguish the ballot from others marked as required by the statute".

In the instant case the questioned ballot, because of the visible erasure, is easily distinguishable from the other ballots. Whether the voter intended so to mark his ballot as to make it distinguishable from others or not, we do not know, nor is it possible for us to know. The reason for making any mark on a ballot other than that prescribed by law, or for erasing therefrom any mark put thereon by him, is known only to the voter himself.

■ The rule which we have adopted and which is the correct one to follow is that, if there are such marks or erasures on the ballot as may reasonably serve the purpose of marks of identification, the ballot is spoiled and should be rejected. This rule, we find, is followed in other jurisdictions. In Sylvestre v. Board of Aldermen, 43 R.I. 492, 111 A. 881, 883, the Supreme Court of Rhode Island had this to say: "Each of the Exhibits 2 to 4, inclusive, shows that the voter attempted to erase a cross. The voter either made a cross where he did not intend, or changed his mind after making the cross; in either event he should have returned the spoiled ballot and obtained another. * * * Each of these ballots, by reason of the attempted erasure, bears a distinguishing mark. In our opinion said board did not err in refusing to count Exhibits 2 to 4, inclusive."

That case is on all fours with this one. In another case, Nicely v. Wildey, 210 Ind. 640, 5 N.E.2d 111, 114, the Supreme Court of Indiana held in an election contest case that, where "the voter made an X within the circle, and then erased the same; the ballot is mutilated and invalid". In other jurisdictions, courts have expressed a contrary view.

The only Louisiana case where the facts involved were identical with those involved in the case at bar and where it was held that the ballot was not spoiled because of the erasures is Hebert v. Landry et al., 193 So. 406, decided by the Court of Appeal, First Circuit, on January 31, 1940. The court there held that it was evident that the voter made a mistake and that in making the erasure he was making an honest effort to correct an honest error. We think the court erred, for the reasons which we have stated above.

Our opinion is that the trial court did not err in his ruling that the questioned ballot was properly rejected by the commissioners as spoiled.

The remaining question is whether the ballots deposited by error or mistake of the voters in the state box at Precinct 1, Ward 7, instead of the parish box, should have been counted by the commissioners.

The testimony shows that the commissioners opened the parish box first, counted and tabulated the votes found therein. They made out the tally sheet showing that the plaintiff Bell had received 185 votes and that the defendant Guenard had received 87 votes, these totals being written in words and in figures. It was found, however, that there were in that box 22 ballots less than the list kept by them showed were voted. The commissioners proceeded then and there to open the state box, in which were found the 22 missing parish ballots. As these parish ballots were withdrawn from the state box, they were placed under one of the boxes and kept until the count and tabulation of the votes in the state box were completed. Then the 22 parish ballots were examined by the commissioners. They found that 13 of them were cast for the plaintiff Bell and 9 of them for the defendant Guenard. The commissioners then obliterated with pen and ink the totals already placed on the tally sheet, added 13 to Bell's total of 185, making his total 198, and added 9 to

Guenard's total of 87, making his total 96, and wrote in words and figures these revised totals instead of those previously written.

All this was done at one and the same sitting of the commissioners and clerks and before the returns were completed and signed. It is not suggested that either the commissioners or the voters committed any intentional fraud. The ballots were placed in the state box through error on the part of the voters themselves. It is conceded that such was not an unusual occurrence and that it has been the practice in the Parish of East Carroll for many years to count votes, either for state candidates or for parish candidates, which were found by the commissioners in the wrong box. It is conceded further that the mistake made by the voters in this instance was one which might be made by any voter, because the boxes which were alike in appearance were both on the same table, side by side.

██ The trial judge held, and correctly, that these ballots were not illegal merely because they had been deposited in the wrong box through error. In commenting upon this point, he said in his written opinion:

"In the instant case there was no fraud or irregularity shown. The Commissioners simply added to the votes already compiled for parish officers, the vote found in the state box and then revised the totals. It is true that such action on the part of the Commissioners might technically be called an irregularity, but on the other hand, to say that because a number of voters honestly and through error, had placed the ballots in the wrong ballot box, they by this action, should ipso facto be deprived of their vote, does not appear to this Court to be responsive to our Democratic form of Government.

"The ballots themselves were perfectly legal; they had been marked in the proper manner by the voters; they had not been spoiled; they were in every way legal ballots except that they were inadvertently placed in the wrong box. The Commissioners themselves, sworn officers of election, found no irregularity. They opened the box and as a matter of course added these votes to the others cast. It evidently never entered their minds that this action was even technically illegal.

"It is also a matter of common knowledge that the custom of taking State votes from Parish boxes and vice versa, has been handled as a routine procedure for a long period of time. This is the general custom which on its face is so fair and reasonable, that it apparently has never before been brought to the attention of the Superior Courts.

"The rules and regulations controlling voting at elections are for the guidance of the voter and the protection of his ballot. To interpret these regulations so as to defeat an expression of an elector's choice seems to this Court to be defeating the very purpose of the statutes. The sole purpose and intent of these laws are to aid and assist electors in the free and fair expression of their will.

"It would be very unreasonable, in this Court's opinion, to hold in the absence of

a clearly defined and express provision of the law or a ruling by our Supreme Court explicitly covering this point, that the interest of the people should be sacrificed and the free expression of the will of the electors, set at naught to force compliance with an alleged technical requirement of the Election Law."

We approve the ruling of the district judge on this point. Counsel for defendant cited, and the judge in his written opinion referred to, the case of Reeves v. Dean, 138 La. 889, 70 So. 871, 873, where this court said, referring to a ballot deposited in the wrong box: "There is no merit in the complaint that the commissioners refused to count a ballot found in the box provided for the election or nomination of state officers, after they had counted and tabulated the ballots cast for the parish officers."

Whether the facts and circumstances connected with the counting of the ballots in that case are like those in the present case is not shown by the opinion. It may be that the court in that case had before it testimony which warranted its ruling. If, however, the facts there were the same or substantially the same as they are here, our opinion now is that the ruling in that case was erroneous.

Finally, counsel for defendant argue that the exception of no cause or right of action was good and should have been sustained. Counsel say in their brief: "A careful reading of contestant's petition will show that the sole purpose of this suit is to have the election declared a tie.

We take the position that where such is the position of a contest, the contestant has no standing in Court because he does not claim to be the nominee for the office."

Counsel are mistaken. The purpose of the suit, as clearly stated in the petition and in the prayer, was to have it decreed that plaintiff was the nominee because he had received a majority of all the votes cast. Counsel further say in their brief that plaintiff's allegations show that the ballot which was rejected as spoiled was in fact a spoiled ballot. As a matter of fact, it is a spoiled ballot. But plaintiff alleged that the ballot was valid and should have been counted for him. The question whether or not it was a spoiled ballot was one to be determined by the court, and plaintiff had a right to have that question presented to, and decided by, the court.

Plaintiff alleged and contended before the lower court and before this court that he was entitled to credit for one additional vote at Precinct 2 of Ward 5 and was entitled to have counted for him the ballot cast for him in Precinct 1 of Ward 5 which was rejected as spoiled by the commissioners. He alleged and contended that, if he were given credit for these two additional ballots, his total vote would be 911 instead of 909, as credited to him by the Committee, and he would therefore be nominated by a majority of one vote.

The trial judge did not err in overruling the exception of no cause or right of action.

Giving plaintiff credit for one additional vote in Precinct 2 of Ward 5, and rejecting as spoiled the ballot cast for him in Pre-

cinct 1 of Ward 5, leaves the candidates with the same number of votes, 910. There being a tie, there was no nomination.

Our decree has already been written and handed down, as shown above.

O'NIELL, C. J., and FOURNET, J., are of the opinion that the contestants had no right of action.