## WELCH v. FITZGERALD.
### No. 1073.

Court of Appeal of Louisiana.   First Circuit.
Oct. 15, 1932.

Reasons for Judgment Filed Nov. 7, 1932.

# 74

Vance Plauche, of Lake Charles, for appellant.

Hawkins & Pickrel, of Lake Charles, for. appellee.

LE BLANC, J.

In cases of this nature the appellate court has to hand down its decision within twenty-four hours after submission. As has already been observed by the appellate courts in this state, twenty-four hours is a short period of time in which to give careful and mature consideration to the several issues which may be and are frequently involved in these generally closely contested cases, and it is almost impossible to prepare such reasons for judgment as the court would like to do. In view of such a situation and of the positive requirement of the law, we will, for the present, in this case, as has lately been done in the case of McConnell v. Salmon, 174 La. 606, 141 So. 73, content ourselves with assigning oral reasons for the decree herein issued and reserve the right to later file a written opinion in the case. We might mention here, however, that our written reasons will be based largely on the decision of the Supreme Court in the McConnell Case, above cited.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby reversed, avoided, and set aside, and it is now ordered that there be judgment herein in favor of the defendant, L. C. Fitzgerald, contestee, and against the plaintiff, Harry H. Welch, rejecting the latter's demands and dismissing his suit at his costs.

### Reasons for Judgment.

This case involves a contest over an election for member of the Jefferson Davis parish school board for ward 1 of that parish. The parties to the contest were the only two candidates in the Democratic primary election called for and held on September 13, 1932. The Parish Democratic Executive Committee, after canvassing the returns, found that L.

C. Fitzgerald, defendant herein, had obtained two votes more than Harry H. Welch, plaintiff herein, and declared him the nominee of the party.

Alleging that there were irregularities in the counting of the ballots at both election booths in the ward, and that there were illegal votes counted which should have been rejected, all of which, if properly done, would have changed the result of the election, Harry H. Welch, the contestant, instituted this proceeding to have himself declared the nominee.

Fitzgerald answered plaintiff's petition by denying the irregularities therein charged, and averring, to the contrary, that the election was legally held and that the result, as tabulated by the commissioners, should be ordered to stand. He prays for a dismissal of plaintiff's suit and that he be declared the Democratic nominee. In the alternative he prays that if the court should hold that there were any irregularities and that illegal votes were cast, the election be annulled and another primary election be ordered held in the ward.

Upon the case being taken up for trial, the court required the plaintiff to establish by prima facie proof a reasonable probability of some error, in the count of the ballots, before he would be permitted to introduce the ballots themselves in evidence. Such proof having been adduced to the satisfaction of the court, it was then ordered that the ballot box of precinct 1 of the ward, referred to as the Lake Arthur precinct, be produced so that it could be opened and examined in open court. It may be stated at this point that the contest, as it appears before us, involves the results of the Lake Arthur box only, as the charges of irregularities at the other precinct known as the Thornwell precinct were not supported by the required proof.

Upon the Lake Arthur box being produced in court, counsel for defendant objected to the introduction of the ballots in evidence for the reason that plaintiff had failed to prove that the box had not been tampered with since the election. The court then, to use its own language, ruled that "the plaintiff may proceed with his testimony, to show, if he can, that the ballot box has not been tampered with since it left the hands of the Commissioners." In this ruling, the court was perhaps a bit more liberal toward the plaintiff than it should have been, as is indicated from the latest decision of the Supreme Court of the state on this point, in the case of McConnell v. Salmon, 174 La. 606, 141 So. 73, 76. In that case, the court held that the question presented was not whether the boxes and the ballots were in fact tampered with, but whether "they were so exposed as to have afforded an opportunity to be tampered with." Obviously, the burden of showing that the boxes have not been

actually tampered with is far lighter than to show only that they have not been exposed as to have afforded an opportunity of having been tampered with.

After a certain amount of proof had been offered, the court held that the same "established reasonable care by the custodian of the box, and the extreme improbability, if not impossibility, of unwarranted persons tampering with it." The box was then opened and the ballots were recounted in open court. The result of the recount showed that there were twenty-two more ballots in the box than had been accounted for by the commissioners. Several of these were questioned by the defendant, but allowing him every one of the questioned ballots, there still remained a difference of seven votes in favor of the plaintiff. Upon this finding judgment was rendered in favor of the latter declaring him the nominee of his party. The defendant appealed.

The prima facia proof which the lower court found sufficient to have established a probability of some error in the count of the votes by the commissioners does not impress us as strongly, perhaps, as it seems to have the trial judge. We pass over the matter without further comment, however, as our decision of the case rests on the other point involved, which is with regard to the exposure of the Lake Arthur box in such manner as to have afforded an opportunity of being tampered with.

█ Following what it refers to as the general rule which prevails in this state and elsewhere, the Supreme Court in the case of McConnell v. Salmon, cited supra, places the burden on the one desiring to offer the ballots in an election contest in evidence, of proving, "with reasonable certainty that they had not been tampered with since the election, or that their preservation has been such as to exclude any reasonable opportunity of tampering with them, or that they have been so kept as to render it improbable that they could have been tampered with." The court appears to have left no doubt as to its position with regard to the proper observance of the requirements of the law on the part of those intrusted with the duty of conducting an election for public officers under our system of government. The provisions of our law in these matters are held to be not merely directory, but mandatory, and, so that the presumptive purity of the election can be given its fullest effect, it must be shown by the one challenging the official count that the ballot boxes, after the count has been completed, have been guarded with that zealous care which the law contemplates before they can be reopened and allowed to overthrow the results as officially announced. The following is quoted with approval by the court, from McCrary on Elections, p. 346:

"The danger that the ballots may be tampered with after the count is made known, especially if the vote is very close, is so great that no opportunity for such tampering can be permitted. Such ballots in order to be received in evidence, must have remained in the custody of the proper officers of the law from the time of the original count until they are produced before the proper court or officer and if it appears that they have been handled by unauthorized persons or that they have been left in an exposed and improper place, they cannot be offered to overcome the official count."

How pertinent is that language in this case, where it is recalled there was a difference of only two votes, will appear later as we review the facts involved.

█ Under our Primary Election Law, Act No. 97 of 1922, under which the election in this case was held, the manner in which the integrity of the ballots is to be preserved is pointed out by section 25, which provides as follows:

"The ballot boxes containing the ballots, poll list and tally sheet shall be carefully sealed after the count shall have been completed and the returns signed and sworn to, shall be deposited with the respective clerks of the District Courts throughout the State and in the Parish of Orleans with the Clerk of the Criminal District Court, by the Commissioners of election."

With the foregoing considerations and this mandatory provision of the law just quoted before us, let us now devote our attention to the facts in the case.

To begin with, we find that on the night of the election, after the ballots had been counted, the tally sheets made out, and the box closed, one Jesse Andrus, constable of the ward in which the precinct is located, took charge of the box and carried it with him to his house, where, he tells us, it remained until about 8 o'clock the following morning. Andrus does not appear to have had any qualifications as one of the officers of the election that had been held, he satisfying himself merely by saying that he is constable of the ward and that the sheriff appointed him as deputy at that election booth. Granting the latter fact, that of itself did not constitute him an officer in that election, as his appointment as deputy had to come from the Democratic Executive Committee of the parish, under whose authority the primary election was being held. See section 22 of the Primary Election Law, Act No. 97 of 1922. As far as this election was concerned, therefore, Mr. Andrus was unauthorized to act in any capacity, and during the time that the ballot box was in his hands, it cannot be said to have been in the custody of the proper officers of the law. Moreover, it is to be observed that our Primary Law, as not-

ed in section 25, hereinbefore quoted, makes it the duty of the commissioners, and not of the deputy sheriff, to deposit the ballot box with the clerk of court, and the inference to be drawn from that is that it is to remain in their custody until it is so deposited with the only officer authorized by law to receive it.

There is no direct evidence in this case to show whether the box in question was sealed or not. It does appear, however, from the testimony of the clerk of court, that it was in the same condition when produced in court as it was when it had been delivered to him, and, in arguments and brief of counsel for defendant, not disputed by counsel for plaintiff, it is stated that the box was not sealed as it appeared when produced in court, and that the key was attached to it. Of course, we do not mean to accept this as evidence of the fact one way or the other, but have cited it to show the doubt in which the contestant has left the case on this most important point.

From Mr. Andrus' testimony, we learn further that the box remained in the living room of his house until he took it with him to the clerk of court at Jennings, La., on the morning following the election. It is not pretended that any special effort or precaution was made by him to guard the box. Indeed, when asked whether he remained at his home all of that night, he facetiously answers: "I guess so. My wife said I was." In the case of Matte v. Matte, 7 La. App. 422, this court had to deal with a question similar to the one here under discussion, and it was there held that a ballot box, which had been shown to be in the custody of the deputy sheriff overnight after an election, was properly received in evidence and the ballots taken therefrom properly recounted in open court. But the facts disclosed in that case, as pointed out in the opinion, show the most zealous care and attention on the part of the deputy sheriff to properly safeguard it and keep it from being tampered with. It was shown to have been kept in a locked room and that some one remained continually therein with the box until it was called for by the commissioners to be carried by them to the clerk of court. The very serious effort on the part of the deputy sheriff to properly protect the box in that case rather accentuates, by comparison, the action of the alleged deputy in this case who seems to have made no pretense whatever to do so.

Pursuing the facts further, we find that the box was delivered on the day following the election to Mr. Clarphy Pitre, clerk of court at Jennings, La. It does not appear certain from the testimony who was with Mr. Andrus when it was delivered. Mr. Andrus himself says that Mr. Gerald Mouton, the commissioner, was with him, although from the evidence there is nothing to show that the lat-

ter was a commissioner. Mr. Pitre says that he doesn't know who it was. On receiving the box, Mr. Pitre says that it was left in the corner of his office, where it remained until the following day, when it was taken and placed in the basement of the courthouse. There it remained for a period of six days in a room which was not under lock and key and which was in access of almost anybody who cared to go there. Of course, neither the clerk nor any of his deputies who occupied his office saw any one actually go into this basement except the janitor of the building or perhaps some one connected with the sheriff's office, nevertheless their testimony leaves no doubt of an impression that some one may have gone to the basement without their knowing of it. On September 19th, the day on which this suit was filed, the clerk of court seemed to have realized himself that the box was not in as safe a place as it probably should have been, for on that day, he testifies, he went down to the basement, took all the boxes, and put them in the vault. We presume he refers to the vault in his office, which evidently was a place offering greater security than the basement under the courthouse. This latter action on the part of the clerk strikes us as being most significant in considering the point involved in this discussion, and convinces us that this ballot box was so exposed as to have afforded a reasonable opportunity of having been tampered with. No ulterior motives are impugned to this clerk nor to any of his deputies, and neither do we wish to cast any reflection whatever on Mr. Andrus, the deputy sheriff. Despite all of their testimony that in their estimation the box was not tampered with, the fact remains that that is not the point at issue in the case, the question being merely: Was the box exposed in such manner as to have given any one a reasonable chance to tamper with it?

Under the facts in the case we have come to the conclusion that the plaintiff has not carried the burden which the law imposed upon him before he could have been permitted to have the boxes opened in court and the ballots introduced in evidence in order to overcome the official count made by the sworn officers of election, and the returns as promulgated by the executive committee of the Democratic Party in the parish under whose authority this primary election had been held.

We believe the lower court was in error in its ruling, and it follows that the judgment rendered below as a result of that ruling was incorrect.

We have heretofore rendered a decree in this case reversing the judgment of the lower court and rejecting the plaintiff's suit at his costs. We reserved the right at that time of handing down additional reasons for judgment and file these herewith under the reservation made.